11 A.3d 844

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES,
PLAINTIFF–RESPONDENT, v. P.W.R., DEFENDANT–AP-
PELLANT, AND L.C. AND C.R., JR., DEFENDANTS.

IN THE MATTER OF A.R., MINOR–RESPONDENT.

Argued October 13, 2010—Decided January 26, 2011.

*Mary K. Potter,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Peter D. Alvino* Senior Deputy Attorney General, argued the cause for respondent Division of Youth and Family Services (*Paula T. Dow,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Mr. Alvino* and *Eva M. Serruto,* Deputy Attorney General, on the briefs).

*Melissa R. Vance,* Assistant Deputy Public Defender, argued the cause for respondent A.R. (*Yvonne Smith Segars,* Public Defender, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

In this appeal we are called on to review an abuse and neglect judgment entered against a parent. Petitioner [1] contends that the

---

[1] For ease of reference, fictitious names will be used to refer to the family members involved in this action. Hereinafter, petitioner or "Pam" will refer to P.W.R.

Division of Youth and Family Services (DYFS or Division) deprived her of adequate notice and opportunity to defend a Title Nine [2] action concerning her then-teenage stepdaughter. She also challenges the sufficiency of the evidence that supported the abuse and neglect findings of the trial court, which were affirmed on appeal.[3] *N.J. Div. of Youth & Family Servs. v. P.W.R.*, 410 *N.J.Super.* 501, 504, 983 *A.*2d 598 (App.Div.2009). We granted her petition for certification, 201 *N.J.* 440, 991 *A.*2d 230 (2010), as well as her subsequent motion to limit the scope of the appeal, thereby shedding a procedural issue that was the primary focus of the appellate panel below.

We agree that petitioner received inadequate notice and opportunity to defend in these proceedings. DYFS's complaint, which stated that its investigation had "concluded that physical abuse was unfounded," signaled that no charge of physical abuse would be advanced; and yet, physical abuse figured into the trial court's findings.[4] Ultimately, however, a more fundamental problem renders the judgment below defective. The record in this matter was simply inadequate to support actionable abuse or neglect by petitioner. The parental decisions made within this family unit may not have been exemplars of stellar parenting, but they did not rise to the level of Title Nine violations. We hold

---

[2] *See N.J.S.A.* 9:6–8.21 to –8.73. "The New Jersey Legislature has enacted two 'separate and distinct' statutes to protect children from abuse and neglect and to provide for the termination of parental rights. Title Nine governs the adjudication of abuse and neglect cases, while Title Thirty sets forth the procedures for the permanent removal of children from their parents." *State v. P.Z.*, 152 *N.J.* 86, 96, 703 *A.*2d 901 (1997). Title Thirty is not implicated here.

[3] Petitioner seeks only reversal of the abuse and neglect judgment against her. Custody is not in issue as petitioner did not seek it and, in any event, the stepdaughter is no longer a minor.

[4] DYFS also introduced evidence of a range of unpled behavior that was asserted to support findings of abuse or neglect. Petitioner shares in responsibility for the status of the record that was developed in that, although she was in default at the hearing, her attorney failed to object to the evidence of unpled conduct.

that the evidence was insufficient to support the violations found here.

DYFS has many serious cases, and even more numerous referrals that necessitate investigations requiring the agency to wade into difficult family problems in order to protect children. Its task is hard. DYFS must be vigilant, but it must be vigilant within the bounds of law. Here an accumulation of events provided a good motive for DYFS to investigate petitioner, but that beneficial motivation did not lead to the establishment of abuse or neglect violations by petitioner. The findings of abuse and neglect entered in this matter based on this record were insufficient as a matter of law and, therefore, the judgment entered against petitioner must be reversed.

## I.

### A.

Before the Appellate Division, the predominant issue was the trial court's entry of default against petitioner, Pam, when she failed to attend the fact-finding hearing, at which her attorney was present to "represent her interests." *P.W.R.*, *supra*, 410 *N.J.Super.* at 503, 983 *A.*2d 598. Although the panel concluded, rightfully, that the default was improper, it determined that it ultimately was inconsequential, and affirmed the judgment that abuse and neglect had occurred. *Id.* at 510, 983 *A.*2d 598. Because petitioner no longer challenges the default's entry, we turn to the merits of the judgment against her.

### B.

DYFS filed its charges against Pam and her husband, Charlie, based on their care and supervision of Alice, who was sixteen at the time DYFS received a referral about her. The referral came from Alice's paternal grandfather, who lived in Maryland and who, at one time, had custody of her. A brief summary of the family's background will provide context for the present appeal.

Alice was born on May 17, 1991, to Charlie and L.C.[5] From 1993 to 2001, Alice's paternal grandfather had physical custody of her.[6] He cared for Alice while Charlie underwent treatment and rehabilitation for substance abuse. Briefly in 2001, Alice lived with her grandfather's first wife who resided in Newark, New Jersey, but shortly thereafter she was reunited with Charlie and lived with him until the instant dispute arose in February 2008.[7] During the period of time that father and daughter lived in the same household, Charlie married Pam.

After Alice left her grandfather's care, he remained interested and involved in her life and well-being, to the extent Charlie permitted. As the grandfather described it at the hearing below, he provided Alice with financial support for items and services that, he said, Charlie could not afford, such as certain medical services and counseling, money for clothes, and non-designated "spending" money. However, due to apparently strained father-son relations, Charlie strictly limited Alice's contact with her grandfather, making that a contentious point among Alice, Charlie, and Pam, as well as the grandfather. That simmering problem provides some background to the DYFS referral made by the grandfather after he received a distraught call from Alice.

On February 8, 2008, Alice telephoned her grandfather, complaining, "Papa, I can't take it anymore." In turn, he reported the conversation to DYFS. He informed the agency representative fielding his call that Alice was upset that Charlie and Pam were taking her earnings and "slapping her around." She was planning

---

[5] Alice's biological mother, L.C., appears uninvolved in Alice's life. She resides in a distant state, and did not participate in these proceedings.

[6] He also had legal custody of Alice from October, 1994, until March, 2005.

[7] In 2001, when the grandfather's second wife became terminally ill, he sent Alice to live with his first wife in Newark. However, within months of that move to Newark, Charlie took her to live with him. In 2005, Charlie sought to have legal custody of Alice returned to him, which application his father did not oppose.

to run away. In addition to reporting that information, her grandfather told DYFS that he was concerned about Alice's safety because 1) Charlie "suffered from long fits of depression and would go off into these angry spells," 2) he believed Charlie was using drugs again, and 3) he was concerned about Charlie's ability to care for Alice. DYFS immediately opened an investigation and assigned Ms. Rivera, a family-service specialist, to the referral.

That same day, Ms. Rivera telephoned Alice's grandfather, who reiterated his concerns about Alice. She dissuaded him from driving to New Jersey to get Alice. She then attempted to contact the family. Finding no one home at the family's Hillside, New Jersey residence, she left a business card. Later that day Alice called the number on the card and told Ms. Rivera that "she did not want it to get this far," and that she did not want DYFS involved. She expressed concern that her parents would learn that she had been talking to her grandfather. When Ms. Rivera persisted, explaining that she had to investigate the allegations, Alice told Ms. Rivera that Pam, not Charlie, would slap her, and that Pam had struck her as recently as the previous week when Alice returned home late from her part-time job at a fast-food establishment.

Ms. Rivera returned to the family's residence that afternoon,[8] meeting with, and interviewing separately, Pam and Charlie. During his interview Charlie described his relationship with his daughter as "fine." He denied disciplining her with corporal punishment but acknowledged that Pam had. Pressed, he identified an occasion, two years earlier, when Pam slapped Alice's face because she had skipped school. Also, in response to an inquiry about Alice's earnings, he acknowledged that Pam applied some of the money to the "cable bill."

---

[8] Ms. Rivera offered conflicting testimony as to the timing of this visit and the facts elicited from it. It appears that two visits with Pam and Charlie are conflated, one on February 8, 2008, and another on February 14, 2008. The precise chronology is not material.

During her interview, Pam stated that Alice was "a behavioral problem," "disrespectful," and a liar. She also acknowledged that Alice was required to contribute $50 per month for the cable and phone bills, but otherwise said that Alice's earnings were "banked." Pam described the "issues" they were having with Alice: disputes related to her sexual experimentation; an undesired, pending school transfer; and a boyfriend relationship. Pam also answered questions about Alice's medical and dental history.[9] At the conclusion of the interview, after looking throughout the house and calling Alice's employer to determine whether Alice had arrived for work, Pam became concerned that Alice might have run away.

Two days later, on February 10, 2008, Pam reported to DYFS and to the police that Alice had run away. She made another report to DYFS on February 12, 2008, to the same effect. The next day, Alice's grandfather contacted DYFS to inform the agency that Alice had "been staying from place to place" with friends since running away from home, and that she was currently at her therapist's office. He also said that Alice stood to gain a substantial inheritance from his recently deceased wife and that his son and Pam harbored feelings of anger that he would not turn over the money to them.

Following the report of Alice's whereabouts, a DYFS special response unit went to the therapist's office, where Alice repeated her allegations that Pam "is always slapping her around" and "hitting her in the face." In the course of the interview, Alice admitted to being sexually active, but denied being pregnant. A DYFS employee escorted Alice home where Pam and Charlie repeated their concerns about Alice's lying, sexual activity, and immaturity. According to Pam, Alice's boyfriend was currently

---

[9] The upshot to that aspect of the interview was that Alice had not had a pediatric examination in two years, and that she last saw a dentist for a check of her braces six months earlier. Pam added that she would accompany Alice to Planned Parenthood for pregnancy examinations, the last of which occurred the previous month.

staying in a Newark YMCA as a result of a DYFS placement, and Alice wanted to stay with him there. During this interview the DYFS worker noticed that the home was cold, described at the hearing as "freezing", and "messy," cluttered with "clothes and junk." [10] Not comfortable leaving Alice in a home in that condition, the worker obtained Charlie's permission to take Alice to an aunt's house for the night.

The next day, supervisors directed Ms. Rivera to provide Charlie and Pam with a Dodd Notice [11] that DYFS would be effecting an emergency removal of Alice from their home because there was no heat in the residence and because Alice was "very fearful of returning home." Ms. Rivera was instructed to evaluate Alice personally and to have her seen by a nurse. Accordingly, Ms. Rivera took Alice to the DYFS office for another interview, in which Alice expressed her fear of going home, said that there had not been heat in the home for months, and complained that her stepmother took her paychecks. She also complained of being slapped in the face when she came home late from work. Adding to her litany of grievances, she told Ms. Rivera that Pam had called her names like "ho," alleged that Charlie used drugs, specifically marijuana and cocaine, and that they did not allow her to communicate with her grandfather, with whom she was close and with whom she wanted to live.

During service of the Dodd Notice, Ms. Rivera observed that the home remained "a little disorganized" and was "very cold." In explanation, Pam and Charlie informed her that their oil tank was in need of repair, that they were attending to the repair, and that

---

[10] During her visit to the home earlier on February 8, 2008, Ms. Rivera also noticed that the home was "messy" with papers and clothing on the floor; however, she was not permitted at the time to complete a full home assessment.

[11] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at *N.J.S.A.* 9:6–8.21 to –8.82. The Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974." *N.J. Div. of Youth & Family Servs. v. N.S.,* 412 *N.J.Super.* 593, 609 n. 2, 992 A.2d 20 (App.Div.2010).

they were using space heaters in critical rooms. In fact, Ms. Rivera observed one in use in the dining room. They continued to deny the allegations of abuse and neglect. Ms. Rivera also interviewed Alice's school principal, who denied having any concerns that Alice was being abused or neglected, and noted that Alice "was actually doing fairly well" in her school work.

The investigation, when completed, resulted in the conclusion that allegations of physical abuse of Alice were "unfounded." However, neglect was determined to have been substantiated as to both Charlie and Pam "due to safety factors existing in the home and that [Alice] is fearful of returning home."

## C.

On February 15, 2008, DYFS filed a Verified Complaint for Custody of Alice and an Order to Show Cause. Pam and Charlie appeared, unrepresented, before the Family Part for a preliminary hearing to determine whether the removal was appropriate.

At a February 28, 2008 hearing,[12] the casework supervisor for the family testified to Alice's allegations of corporal punishment, the home being cold, and Alice's fear of returning home. However, the supervisor specifically informed the court that the allegation of physical abuse was "unfounded" because Alice "had no injuries," and the hits "did not rise to the level of—of abuse." She stated that those complaints were the only issues that caused the removal, but informed the court that the investigation was not fully complete.

Pam also testified, stating that because the family used space heaters, the residence was not without heat. She also told the court that, in her view, the present problem with Alice arose

---

[12] At this hearing, Pam was represented. At the later fact-finding hearing in May, Pam had a different attorney assigned to her. However, prior to the fact-finding hearing's commencement, that attorney informed the court that his client had expressed dissatisfaction with his representation. Nevertheless, the court refused to allow the attorney to withdraw.

because the grandfather had told Alice that his deceased wife had left her more than $100,000, and he wanted to spend it on her.

The court determined that removal was appropriate due to the "lack of central heating, a past history of beatings, and the child's subjective fear of going home after her disclosure to the Division of her concerns." The court placed Alice in DYFS's custody, and set a return date. At the return date, Pam and Charlie appeared, as did a Law Guardian who represented Alice and who expressed concern about Pam and Charlie's contacting of Alice's school and friends. The Law Guardian also presented some requests, including follow-up orthodontic care for Alice's braces. The court ordered that DYFS retain custody of Alice and set dates in May for a fact-finding hearing. However, on the first date scheduled for the fact-finding hearing, May 19, 2008, neither Pam nor Charlie appeared. The court entered a default against each, stating further that Pam and Charlie "would be prohibited from putting on an affirmative defense—unless they successfully move to vacate the default[,]" but indicated that their attorneys would be permitted to cross-examine and to deliver summations.

At the hearing, DYFS presented two witnesses, Ms. Rivera and Alice's grandfather. Also, the following documentary evidence was admitted without objection: (1) the notice of emergency removal; (2) two referrals regarding Alice; (3) three screening summaries; and (4) a contact sheet documenting that a DYFS investigator met with Alice. Neither Charlie nor Pam was present for either of the two days on which testimony was presented. On the third day of hearing when summations were to be delivered, Pam's attorney stated that he had listed Pam as a witness, intending to have her testify, but that she "had had surgery and . . . there were post-surgical infection complications that prevented her from attending." Notwithstanding the attorney's explanation, the court continued to hold Pam in default because of lack of substantiation for the asserted medical unavailability. As noted, Pam's and Charlie's attorneys were permitted to deliver summations.

The court rendered its decision on June 10, 2008. Following a lengthy factual recitation, the court concluded that DYFS had proven, by clear and convincing evidence, that Charlie and Pam abused and neglected Alice:

> In this case the Division has proven that [Pam] and [Charlie] failed to provide proper supervision and guardianship to [Alice] in that [Pam] inflicted corporal punishment on the child and [Charlie], the child's custodian, did nothing to protect his daughter. [Pam] slapped the child around and per the paternal grandfather has a violent nature.
>
> Additionally, the Division has established medical neglect in that the child has not been seen by a pediatrician in two years. Additionally there was no source of central heat in the family [home] during the '07–'08 winter, and the house was described as freezing by the investigating caseworkers whose presence was reasonably to be anticipated by [Pam and Charlie]. . . .
>
> Additionally, [Pam and Charlie] treated [Alice] in essence like Cinderella. Both of the adults were not working on a regular basis when DYFS intervened. Dad was unemployed. He said he did some freelance work. There was no substantiation of how much money that brought in. And the stepmother indicated that she was on medical leave from work. So neither one of them was employed on a regular basis when DYFS intervened, yet they took [Alice's] earnings from her job at a fast-food enterprise. While they indicated in response to one of the worker's questions that they were banking the money for the child, no evidence of such bank account was presented at trial.
>
> Additionally, the targeted defendants took steps to isolate [Alice] from [Grandfather] without just cause and causing—causing the child to have—to resort to surreptitious means to stay in touch with her grandfather and depriving her of the opportunity to attend her beloved grandmother's funeral. Some injuries to a child are indeed worse than physical. Emotional abuse is not visible but the effects can be as dire and can last even longer in this Court's opinion.

The court's order specified that (1) Pam physically abused Alice; (2) Charlie did not intervene when Pam did so; (3) Alice was not taken to a pediatrician in two years; (4) there was no heat in the home; (5) Pam and Charlie took Alice's paychecks to support themselves; and (6) Pam and Charlie isolated Alice from her extended family.

Although advised of the opportunity to move for reconsideration of the orders of default status, it does not appear that Pam ever filed such a motion with the trial court.[13] Instead, Pam appealed,

---

[13] We note only that, post-judgment, custody of Alice was turned over to her grandfather, with whom she went to live in Maryland.

advancing two arguments. The first attacked the merits of the judgment against her, arguing that the abuse and neglect finding "was not supported by substantial credible evidence in the record," and contending that there was no basis for either the finding that Alice was the victim of child abuse (" 'excessive' corporal punishment"), or the conclusion that the conditions in the family residence amounted to child neglect. Secondarily, Pam argued that "[t]he trial court improperly entered a default against" her, because "her attorney was present in court to represent her and the trial court improperly refused to consider the medical excuse for her prior absence."

A panel of the Appellate Division affirmed. *P.W.R., supra,* 410 *N.J.Super.* at 504, 983 *A.*2d 598. With respect to the sufficiency of the evidence, the panel concluded that the argument ·lacked enough merit to warrant discussion in a written opinion. *Id.* at 505, 983 *A.*2d 598 (citing *R.* 2:11–3(e)(1)(E)). However, the panel did agree that the trial court inappropriately entered a default against Pam, *ibid.,* but it deemed the entry to be of "no consequence," in that Pam's attorney was permitted to cross-examine the witnesses against her and to make a closing statement. *Id.* at 510, 983 *A.*2d 598. The panel further noted that Pam never moved to vacate the default "in order to [ ] provide [ ] testimony either before or after the judge rendered her decision." *Ibid.*

We granted Pam's petition for certification, 201 *N.J.* 440, 991 *A.*2d 230 (2010), as limited by subsequent order, to review her claim that she was deprived of her constitutional right to due process, and her statutory right to notice and the opportunity to present a defense, because the DYFS complaint "specifically notified [Pam and Charlie] that the agency was *not* alleging physical abuse"; and her claim challenging the trial court findings, which allegedly represent an "impermissible expansion of the Legislature's definition of child abuse and neglect."

## II.

### A.

Abuse and neglect actions are controlled by the standards set forth in Title Nine of the New Jersey Statutes. *See N.J. Div. of Youth & Family Servs. v. M.C. III*, 201 *N.J.* 328, 343, 990 *A.*2d 1097 (2010) (citing *N.J.S.A.* 9:6–8.21 to –8.73). The purpose animating Title Nine "is to provide for the protection of children under 18 years of age who have had serious injury inflicted upon them." *N.J.S.A. 9:6–8.8; see G.S. v. Dep't of Human Servs.*, 157 *N.J.* 161, 177, 723 *A.*2d 612 (1999) ("Title 9's primary concern is the protection of children, not the culpability of parental conduct." (citation omitted)); *cf. Statement to S., No. 1217*, 196th Leg. (N.J.1974) (declaring that children have "the right of protection from physical abuse and neglect" and that purpose of Title Nine is to ensure children's "rights will be adequately protected by the appropriate courts and social service agencies").

Stepparents are expressly included in the definition of a "[p]arent or guardian" under Title Nine. *N.J.S.A.* 9:6–8.21. And, Title Nine includes within the definition of an "[a]bused or neglected child" persons under the age of eighteen. *N.J.S.A.* 9:6–8.84. Therefore a sixteen-year-old teenager like Alice clearly qualifies for Title Nine protection. The critical issue in the resolution of the instant dispute is that portion of the definition of an "[a]bused or neglected child," which the statute states will include the following:

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court. . . .
>
> [*N.J.S.A.* 9:6–8.21(c)(4); *see also N.J.A.C.* 10:129–1.3 (elaborating on definition of "abused or neglected child").]

In *G.S., supra*, we had occasion to analyze that statutory language. 157 *N.J.* at 161, 723 *A.*2d 612. The facts involved "a medication overdose administered to a child by a caregiver at a facility" for mentally impaired individuals. *Id.* at 166, 723 *A.*2d 612. We found that a plain-language reading of the provision supported the conclusion that injuries caused accidentally can form the basis for a finding of neglect, and held that, "under Title 9, whether the guardian intended to harm the child is irrelevant." *Id.* at 176, 723 *A.*2d 612. In the course of deciding the appeal, we also were called on to interpret the "minimum degree of care" standard contained in *N.J.S.A.* 9:6–8.21(c)(4), and determined that in order to serve the legislative interest in providing protection to children, "a guardian [would be found to have] fail[ed] to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." *Id.* at 181, 723 *A.*2d 612.

In respect of the quantum of proof required in a fact-finding hearing brought under Title Nine, *see N.J.S.A.* 9:6–8.44, it is well established that DYFS must prove that the child is "abused or neglected" by a preponderance of the evidence, and only through the admission of "competent, material and relevant evidence." *N.J.S.A.* 9:6–8.46(b). Such evidence may include "any writing, record or photograph ... made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency," provided it meets certain admissibility requirements akin to the business records exception. *N.J.S.A.* 9:6–8.46(a)(3); *see M.C. III, supra*, 201 *N.J.* at 346–47, 990 *A.*2d 1097. DYFS is permitted to submit into evidence, pursuant to *N.J.R.E.* 803(c)(6) and 801(d), reports by staff personnel or professional consultants. Pursuant to Court Rule, "[c]onclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal." *R.* 5:12–4(d). In addition, "previous statements made by the child relating to any allegations of abuse or neglect [are] admissible in evidence;

provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." *N.J.S.A.* 9:6–8.46(a)(4). Thus, a child's hearsay statement may be admitted into evidence, but may not be the sole basis for a finding of abuse or neglect.

## B.

Abuse and neglect cases are generally fact sensitive. Each case requires careful, individual scrutiny. Many reported cases are idiosyncratic. Thus, for example, one ought not assume that what may be "excessive" corporal punishment for a younger child must also constitute unreasonable infliction of harm, or excessive corporal punishment in another setting involving an older child. *See N.J.A.C.* 10:129–1.3 (defining abused or neglected child as one who suffers due to parent's failure to exercise minimum care "in providing the child with proper supervision or guardianship, by *unreasonably* inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment" (emphasis added)). To the extent we have addressed certain issues related to proof of abuse or neglect, those few decisions deserve brief mention.

Recently, in *M.C. III, supra,* we affirmed a trial court's finding of abuse and neglect, reversing the Appellate Division's conclusion to the contrary. 201 *N.J.* at 345, 348, 990 *A.*2d 1097. The defendant in *M.C. III* was accused of hitting his fifteen-year-old son and punching and choking his thirteen-year-old daughter. *Id.* at 333–34, 990 *A.*2d 1097. The trial court found that the defendant grabbed his son by the neck, and then the defendant, his son, and his daughter fell to the floor. *Id.* at 336, 990 *A.*2d 1097. The court further found that the children had physical injuries consistent with an assault by their father. *Ibid.* In our review of the record, we held that there was sufficient credible evidence to support the trial court's finding of abuse. *Id.* at 345, 990 *A.*2d 1097. That said, neither the trial court nor this Court explicitly credited the abuse based solely on the children's allegations that

the defendant punched and choked them, but rather, relied on a totality of evidence that demonstrated "[d]efendant intentionally grabbed the children and disregarded the substantial probability that injury would [and did] result from his conduct." *Ibid.*

In *G.S.*, *supra*, as noted earlier, we concluded that there was sufficient evidence to support a finding of neglect where an employee at a hospital for mentally impaired persons mistakenly administered a dosage of medication to a disabled minor which was estimated to be seventy-eight times the prescribed amount. 157 *N.J.* at 166–68, 182–83, 723 *A*.2d 612. Although we noted that the employee did not intend to administer an overdose, her "conduct indisputably demonstrate[d] that she failed to exercise a minimum degree of care" and, as a result, the physical condition of the child was impaired. *Id.* at 182, 723 *A*.2d 612. Thus, a demonstration of intent to harm is not required under Title Nine. *Id.* at 176, 723 *A*.2d 612.

And, in *N.J. Div. of Youth & Family Servs. v. K.M.*, 136 *N.J.* 546, 550, 643 *A*.2d 987 (1994), a case where "no substance abuse or physical abuse" was involved, this Court affirmed a finding of neglect where the parents—"[a]lthough physically and financially capable of doing so"—had "failed to provide for their children's basic needs of food, clothing and shelter." *In K.M.*, *supra*, when DYFS first became involved in the case, the defendants' home "was roach-infested, with holes in the walls, exposed wiring, open windows without screens, and gnats stuck to dried paint on the walls." 136 *N.J.* at 551, 643 *A*.2d 987. The defendants' youngest child, who had been born prematurely with an extremely low body weight, "had gained very little weight under defendants' care due to inadequate and infrequent feeding and no medical attention." *Ibid.* The children also were found to be "inadequately dressed, wearing only dirty under-shirts and dirty diapers, and the home itself was persistently filthy." *Ibid.* Importantly, despite DYFS assistance, and intensive parenting-skills programs provided to help the parents, neglect was found when the home conditions did not improve. *Id.* at 552, 643 *A*.2d 987.

Thus, a failure to provide for a child's needs, when a parent is capable of doing so, can support actionable neglect where a child's condition has been demonstrated to be impaired or in imminent danger of being impaired.

## III.

As previously noted, the trial court's written order concluding that Alice was abused and neglected listed six findings for its affirmative conclusion: (1) Pam physically abused Alice; (2) Charlie did not intervene when Pam did so; (3) Alice had not been taken to a pediatrician in two years; (4) there was no heat in the home; (5) Pam and Charlie took Alice's paychecks to support themselves; and (6) Pam and Charlie isolated Alice from her extended family.[14] We address each, as to Pam, in turn.

With regard to the trial court's conclusion that Pam physically abused Alice, Title Nine provides that an abused or neglected child is one

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care .. in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment . . . .
>
> [*N.J.S.A.* 9:6–8.21(c)(4).]

Pam does not dispute that she occasionally slapped Alice in the face as a form of discipline; what she contests is that her actions constituted "excessive corporal punishment."

Although hardly admirable, we agree that such occasional discipline does not fit a common sense application of the statutory prohibition against "excessive" corporal punishment. There was

---

14 Although the court mentioned Alice's purported "fear" of returning home while conducting the removal hearing on February 15, 2008, the court did not rely on that fact in the oral decision rendered in June. The court's subsequent written order concluding that Alice was abused or neglected similarly omitted mention of Alice's fear of returning home.

no evidence developed in this record showing the existence of bruises, scars, lacerations, fractures, or any other medical ailment suffered as a result of Pam's actions. *See Dept. of Children & Families, Div. of Youth & Family Servs. v. K.A.,* *supra,* 413 *N.J.Super.* 504, 511–12, 996 *A.*2d 1040 (App.Div.) (listing such harms as examples of what might evidence corporal punishment), *certif. granted,* 204 *N.J.* 40, 6 *A.*3d 442 (2010). Indeed, DYFS itself found the allegation of physical abuse to be unfounded. That should have put the matter to rest.[15] Before the Family Part, DYFS seemingly agreed; it did not argue that Alice was physically abused. Despite the deferential standard that we apply to the findings of the Family Part courts who hear the oft-difficult and wrenching abuse and neglect actions, we cannot credit the finding of physical abuse made here by the trial court.

 A slap of the face of a teenager as a form of discipline—with no resulting bruising or marks—does not constitute "excessive corporal punishment" within the meaning of *N.J.S.A.* 9:6–8.21(c)(4)(b). That is not to suggest approval of such behavior. But, by qualifying the prohibition with the term, "excessive," the statutory language plainly recognizes the need for some parental autonomy in the child-rearing dynamic that, of necessity, may involve the need for punishment. Limiting state involvement only to interference with excessive corporal punishment requires the exercise of judgment by reviewing courts before a finding of physical abuse is entered against a parent. In this matter, where DYFS labeled the physical abuse "unfounded," the trial court abused its discretion by utilizing the slaps as a basis for a finding of physical abuse. It also caused a fair notice violation because no

---

[15] An investigator's finding that an allegation is "unfounded" requires consultation with a DYFS supervisor. *N.J.A.C.* 10:129–2.7. *N.J.S.A.* 9:6–8.40a(a) requires DYFS to "expunge from its records all information relating to a report, complaint, or allegation" of abuse or neglect that is determined to be unfounded. Hemmed by the investigative determination that Alice's claims of physical abuse were unfounded, DYFS made no such assertion at trial, consistent with its pleading of the claim as "unfounded." Nevertheless, the trial court erroneously used the claim as support for its finding of physical abuse.

lay person served with the DYFS complaint in this matter would reasonably read the complaint to indicate that a claim of physical abuse would be advanced at the hearing. But, more importantly, our reversal of this finding goes to its core. The proofs simply were insufficient to support a finding that Pam physically abused Alice.

 Second, the fact that there was a problem with the central heat in the home should not, standing alone, constitute neglect. DYFS documents admitted into evidence demonstrated that, per Ms. Rivera's observation, space heaters were in use in the home. The statute provides that a child can be considered abused or neglected if the parents or guardians fail "to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so. . . ." *N.J.S.A.* 9:6–8.21(c)(4). There is no evidence in the record that Charlie and Pam were financially able to cure their larger central heating problem but were refusing to do so, nor is there evidence that DYFS made any attempt whatsoever to assist them in fixing the heating problem. The record demonstrated that both Charlie and Pam were temporarily out of work. That DYFS did not make any offer of assistance to remedy the heating problem is troubling, particularly to the extent that the deficient central heating component of the home was used as a basis for removing Alice.

 For similar reasons, it is hard to conclude that Alice was abused or neglected simply because Pam and Charlie took some portion of Alice's paychecks to support the family's phone or cable bill,[16] or because she was not taken to a pediatrician in two years. As to the former, impecuniousness cannot be the basis for having

---

[16] According to Pam, she took $50 per month from Alice's paycheck to pay for the cable and phone which was in Alice's room, and put the rest in the bank. The only contrary evidence came by way of Alice's hearsay statement that Pam was "taking" her money.

one's child taken from him or her. Requiring working-age children to contribute to the support of the family is not an actionable reason to remove the child from the family home. Despite financial difficulties, many parents have raised children appropriately free from state interference. The trial court's citing to the family's demand that Alice contribute to family bills as evidence that she was an abused or neglected child is simply wide of the mark. *See N.J. Div. of Youth & Family Servs. v. M.M.*, 189 *N.J.* 261, 279, 914 *A.*2d 1265 (2007) ("[W]e will accord deference unless the trial court's findings went so wide of the mark that a mistake must have been made." (internal quotations and citations omitted)).

Further, with regard to the alleged medical neglect, there was no evidence submitted that Alice's "physical, mental, or emotional condition [was] impaired or [was] in imminent danger of becoming impaired" simply because she had not seen a pediatrician in two years. She had been going with Pam to Planned Parenthood for pregnancy checks and DYFS never demonstrated proof of a physical condition, other than possible pregnancy, for which Alice required pediatric care that was not sought. We also know from this record that Alice had been provided with braces paid for by her parents, but, according to the Law Guardian, she was behind in having them checked for adjustment. Based on their temporary financial setbacks, the parents' judgment to delay completing Alice's teeth-straightening process hardly constituted a form of medical neglect. Again, those complaints neither individually nor collectively reasonably rise to actionable "medical neglect," and the trial court findings to that effect are so wide of the mark as to be unsustainable. *Ibid.*

Finally, we cannot agree that Pam and Charlie's decision to limit Alice's contact with her grandfather constituted emotional impairment meant to be actionable by the statutory inclusion of impairment to a child's "emotional condition" in the definition of an abused or neglected child. *See N.J.S.A.* 9:6–8.21(c)(4). Parents have a fundamental right to parental autono-

my, and with respect to a grandparent's visitation rights, the burden is on the grandparent to establish "by a preponderance of the evidence that visitation is necessary to avoid harm to the child." *Moriarty v. Bradt,* 177 *N.J.* 84, 114–17, 827 *A.*2d 203 (2003), *cert. denied,* 540 *U.S.* 1177, 124 *S.Ct.* 1408, 158 *L.Ed.*2d 78 (2004). There was no showing, through expert testimony or otherwise, that Alice actually suffered mental or emotional harm from the restricted contact with her grandfather. Thus, this finding too is unsustainable.

Before closing, we add the following. In child abuse and neglect cases, we recognize the need to evaluate the totality of the proofs because the evidence can be synergistically related. With that in mind, it is impossible to ignore the difficult home environment present in this family's circumstances. Clearly, there were problems within this family. The question, however, is not whether Alice and Pam struggled over the issues between them, but rather, whether Alice's "physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired" because of Pam. Despite the long list of Alice's complaints, actionable abuse or neglect was not demonstrated. Most of the allegations were the product of the family's tight financial situation, such as the lack of central heating and the family's apparent need for monetary contribution from Alice's part-time job. The dominant allegation of abuse was that Pam slapped Alice in the face, which conduct, although abhorrent to a sixteen-year-old young woman, and hardly admirable, does not fit within the statutory definition of abuse. The remaining instances of alleged abuse and neglect, while not necessarily paragons of parenting, do not satisfy the standard articulated in *N.J.S.A.* 9:6–8.21(c)(4).

In sum, although no parenting awards are to be won on this record, neither was actionable abuse or neglect proven. As stated at the outset, DYFS has many serious cases, and even more numerous referrals that necessitate investigations requiring the agency to wade into difficult family problems in order to protect children. Its task is hard and it must be vigilant, but it must be

vigilant within the limitations of the law that empowers the agency's actions. The record here simply did not demonstrate proof of actionable abuse or neglect of Alice by Pam. It was an error for the courts below to have sustained the findings of abuse and neglect entered against Pam.

## IV.

The judgment of the Appellate Division is reversed and the abuse and neglect judgment against petitioner is vacated.

Chief Justice RABNER and Justices LONG, ALBIN, RIVERA–SOTO, and HOENS and Judge STERN (temporarily assigned) join in Justice LaVECCHIA's opinion.

*For reversal and remandment*—Chief Justice RABNER, Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO, HOENS, and Judge STERN—7.

*Opposed*—None.

