RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0156-15T4
 A-0157-15T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

 Plaintiff-Respondent,

v.

D.M. and C.M.,

 Defendants-Appellants.

_______________________________

IN THE MATTER OF J.M., a minor.
________________________________________________________________

 Submitted March 21, 2017 – Decided June 27, 2017

 Before Judges Koblitz, Rothstadt, and Sumners.

 On appeal from the Superior Court of New
 Jersey, Chancery Division, Family Part, Hudson
 County, Docket No. FN-09-298-13.

 Joseph E. Krakora, Public Defender, attorney
 for appellant D.M. (Jennifer L. Gottschalk,
 Designated Counsel, on the brief).

 Joseph E. Krakora, Public Defender, attorney
 for appellant C.M. (Susan P. Gifis, Designated
 Counsel, on the briefs).
 Christopher S. Porrino, Attorney General,
 attorney for respondent (Andrea M. Silkowitz,
 Assistant Attorney General, of counsel;
 Natasha C. Fitzsimmons, Deputy Attorney
 General, on the brief).

 Joseph E. Krakora, Public Defender, Law
 Guardian, attorney for minor (James J. Gross,
 Designated Counsel, on the brief).

PER CURIAM

 In these two appeals, calendared back-to-back and

consolidated for the purpose of this opinion,1 defendants D.M.

(Diane)2, and her mother C.M. (Carla), challenge the Family Part's

July 12, 2013 order concluding they abused or neglected Diane's

child within the meaning of Title 9, N.J.S.A. 9:6-8.21 to -8.73.

In reaching its decision, the Family Part relied upon Diane's drug

and alcohol abuse, her exposing her child to incidents of violence

with other family members, and her refusal to abide by a safety

plan. As to Carla, the court relied on her failure to keep Diane

away from the child and her inability to provide adequate shelter

for him, both of which also constituted violations of an agreed

upon safety plan. On appeal, defendants argue there was

insufficient evidence to support the court's conclusions.

1
 We previously consolidated these matters for other
administrative purposes.
2
 We use pseudonyms to refer to the family members to protect
their privacy.

 2 A-0156-15T4
 We conclude that the Family Part's decision was supported by

substantial credible evidence that demonstrated both defendants'

conduct recklessly created a substantial risk to the child's mental

health and physical safety. See N.J. Div. of Youth & Family Servs.

v. A.L., 213 N.J. 1, 8-9 (2013). Accordingly, we affirm.

 The salient facts are derived from the fact-finding hearing

record. Twenty-six year old3 Diane's only child is J.M. (Joey),

who was born on October 20, 2003.4 Carla is Diane's mother.

 The Division's first involvement with the family was in 2008.

At that time, Carla had custody of Joey and was having problems

caring for Joey, allegedly due to Diane's drug abuse. The Division

investigated, found Carla's home to be in deplorable condition,

provided services, and closed its file. The Division received

another referral in 2012 based upon allegations of violence between

Diane and Carla that were witnessed and later confirmed by Joey.

According to Carla, these altercations were the result of Diane's

drug abuse. The Division filed a complaint to permit it to

3
 Diane's age at the time of the fact-finding hearing.
4
 Joey's father, R.P., had been incarcerated for many years and
played no role in Joey's life. The Division did not seek any
relief against R.P.

 3 A-0156-15T4
investigate.5 The court ordered Diane to undergo a substance abuse

evaluation and Carla to be psychologically evaluated.

 On January 14, 2013, the Division responded to a referral

from Joey's school that Carla was concerned with Diane's drug use

and Joey's performance in school. Carla also reported an incident

that occurred over New Year's Eve when Joey saw his intoxicated

mother naked on a bathroom floor. The same day, a caseworker met

with Joey at school. Joey confirmed that he heard his mother

vomiting in the bathroom and although he denied seeing his mother

use drugs or alcohol or seeing his mother and grandmother fight

in the home, he "fidget[ed] with his hands throughout the

interview" and "remained protective of [Diane] throughout the

interview."

 The same day, the Division caseworker also met with Carla at

the family home, where she reported instances of domestic violence

between her and Diane. Carla admitted to previous attempts to

remove Diane from the home, but Diane would return and Carla would

let her back in so as not to upset Joey. Carla also explained

Joey was in individual therapy to help deal with the contentious

relationship between her and Diane. During this visit, the

caseworker observed the home to be in a deplorable condition, with

5
 See N.J.S.A. 30:4C-12.

 4 A-0156-15T4
an immense amount of personal belongings and renovation supplies

and equipment filling the rooms and hallways of the home. She

later testified that she was concerned about the family's ability

to maneuver in the home in the event of an emergency. The

caseworker provided Carla with Chore services, which could assist

her in cleaning and organizing her home, and Carla agreed to

correct the problem.

 At the end of the visit, the Division executed a safety

protection plan with Carla. Under the terms of the plan, Carla

would have Diane immediately leave the home where Carla and Joey

resided and agreed she would correct her hoarding-like behavior

by January 18, 2013. The Division also "substantiate[d] the

allegations of physical injury/environment injurious to health and

welfare" against Diane and Carla.

 The following day, the caseworker met with Diane at the family

home and observed her belongings packed. Diane admitted to a

history of drug and alcohol abuse, but denied current use even

though during the interview she had slurred speech, glassy eyes,

and could not remain still. Diane also agreed to submit to a

urine screen test the same day at the Division office, and she

tested positive for cocaine and phencyclidine (PCP).

 On January 18, 2013, the Division caseworker visited the

family home again to assess whether progress had been made in

 5 A-0156-15T4
removing the bags of clothing and construction materials. She

observed Carla had made progress and encouraged her to continue

and informed Carla of Diane's positive drug screening from January

15. The caseworker reiterated the terms of the safety protection

plan that restrained Diane from the home, and it was at this

meeting that Carla also agreed she would not allow Diane to have

unsupervised contact with Joey.

 The Division caseworker returned to the home on January 25,

2013, and observed remodeling had begun and continued progress had

been made in removing the hoarded clothing and construction

materials from the home. The caseworker explained to Carla that

cleaning still needed to be done and that Chore services had been

attempting to reach her. Carla explained she would return their

call, and at the conclusion of the visit, the caseworker reiterated

the terms of the safety protection plan which barred Diane from

the home and from having unsupervised contact with Joey. On

February 6, Diane submitted to another drug test, which was

positive for PCP.

 The Division received another referral on February 14, that

indicated Joey disclosed to his therapist that he had recently

witnessed a fight between Diane and her cousins in which Diane was

struck with a metal bat. Joey was being seen by a therapist since

2012 to deal with the stress caused by Carla's and Diane's

 6 A-0156-15T4
relationship with each other. On the same day, a Division

permanency worker visited the home and found Joey asleep in his

bed alongside Diane. She also observed the home was again in

extreme disarray with dishes in the sink, bags of clothing and

other items all over, and rooms overflowing with items to the

point where it made ingress and egress difficult.

 When Carla was questioned about Diane's presence in the home,

especially given the safety protection plan, Carla stated Diane

had come over the previous night and stayed over because Joey did

not have school that day and explained Diane does whatever she

wants. Joey confirmed that Diane was picking him up from school

and that he went with her to her boyfriend's home. The permanency

worker then informed Carla that on February 6, Diane tested

positive for PCP.

 The Division determined a "Dodd removal"6 was necessary to

protect Joey and he was removed from the home due to the tumultuous

home environment, Carla allowing Diane to have unsupervised

6
 "A 'Dodd removal' refers to the emergency removal of children
from the home without a court order, pursuant to the Dodd Act,
which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The
Act was authored by former Senate President Frank J. 'Pat' Dodd
in 1974." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J.
17, 26 n.11 (2011) (quoting N.J. Div. of Youth & Family Servs. v.
N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010)).

 7 A-0156-15T4
contact with Joey, Diane having two positive drug screens, and

Carla violating the existing safety protection plan.

 The Division filed a complaint for care, custody, and

supervision of Joey on February 19, and the court awarded the

Division custody and care of Joey. Joey remained in the Division's

custody until September 2013.7

 The court conducted a fact-finding hearing at which the

Division relied on the testimony of its two caseworkers as well

as documentary evidence, including photographs of Carla's home.

Neither Carla nor Diane testified or called any witnesses on their

behalf.

 After considering the evidence, Judge Bernadette DeCastro

entered the court's fact-finding order and issued a written

decision setting forth her reasons for finding that both Diane and

7
 In September 2013, the Division reunited Joey with Diane, while
maintaining supervision over him. The court granted Diane legal
and physical custody and dismissed Carla from the litigation.
Joey, however, was later placed by Diane with Carla due to Diane's
ongoing struggle with drugs and alcohol. In July 2014, the
Division again conducted a Dodd removal from Carla's custody
alleging she failed to protect him from Diane by not supervising
him closely enough, giving Diane an opportunity to have
unsupervised time with Joey in contravention of another safety
plan. The court ultimately found the Division had not met its
burden of proof and retuned Joey to Diane's legal custody and
Carla's physical custody. In July 2015, the court awarded Carla
and Diane joint legal custody of Joey, with Carla having physical
custody and Diane only allowed supervised contact with Joey, and
it terminated this litigation.

 8 A-0156-15T4
Carla abused or neglected Joey. The judge first recounted the

history of the Division's involvement with the family and its

attempts to address the concerns raised by Diane's drug issues,

her violent behavior, and the deplorable condition of Carla's

home. Judge DeCastro recognized that Carla's and Diane's violation

of the safety plan alone could not justify a finding of abuse or

neglect, but "given the totality of the circumstances," and citing

to N.J.S.A. 9:6-8.21(c)(4)(b), she found that Carla and Diane

placed Joey at a substantial risk of harm. The judge noted that

the plan "demonstrated that [Carla] was aware of her daughter's

drug use which could pose a risk to" Joey. Relying on Joey's

statements to the caseworker, she also found Diane placed Joey at

risk when "she engaged in an act of domestic violence with her

cousin in the presence of and while caring for [Joey]." As to

Carla, the judge observed that despite the Division notifying

Carla that Diane had tested positive for drugs on January 15,

Carla still permitted Diane to have unsupervised contact with Joey

less than three weeks later at the party where the metal bat

incident occurred. Furthermore, Judge DeCastro cited to N.J.S.A.

9:6-8.21(c)(4)(a) and found Carla failed to provide adequate

shelter to Joey, due to the large amount of clutter and hoarding-

like behavior that permeated the home, which created a safety

hazard, as depicted in the photographs that were in evidence.

 9 A-0156-15T4
 The judge entered a fact finding order and eventually

terminated the litigation in 2015. This appeal followed.

 We begin our review by recognizing it is limited and narrow.

We defer to the Family Part's factual findings "when supported by

adequate, substantial and credible evidence." N.J. Div. of Youth

& Family Servs. v. S.I., 437 N.J. Super. 142, 152 (App. Div. 2014)

(quoting N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J.

Super. 427, 433 (App. Div. 2002)). "Where the issue to be decided

is an 'alleged error in the trial judge's evaluation of the

underlying facts and the implications to be drawn therefrom,' we

expand the scope of our review." N.J. Div. of Youth & Family

Servs. v. G.L., 191 N.J. 596, 605 (2007) (quoting In re

Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div.

1993)). The trial judge's interpretation of the law and the

application of such legal conclusions to the facts are subject to

plenary review. See Manalapan Realty, L.P. v. Twp. Comm. of

Manalapan, 140 N.J. 366, 378 (1995). In our review, we consider

the totality of the circumstances in abuse or neglect proceedings.

P.W.R., supra, 205 N.J. at 39.

 "New Jersey's child-welfare laws balance a parent's right to

raise a child against 'the State's parens patriae responsibility

to protect the welfare of children.'" N.J. Div. of Child Prot. &

Permanency v. Y.N., 220 N.J. 165, 178 (2014) (quoting A.L., supra,

 10 A-0156-15T4
213 N.J. at 17-18). "The adjudication of abuse or neglect is

governed by Title 9, which is designed to protect children who

suffer serious injury inflicted by other than accidental means."

S.I., supra, 437 N.J. Super. at 152 (citing G.S. v. N.J. Div. of

Youth & Family Servs., 157 N.J. 161, 171 (1999)); see also N.J.S.A.

9:6-8.21 to -8.73. Title 9 is intended to safeguard children who

have been abused or are at risk of imminent harm. A.L., supra,

213 N.J. at 18, 22. "To that end, Title [9] provides for the

civil prosecution of a parent or guardian who abuses or neglects

a child." Y.N., supra, 220 N.J. at 178 (citing N.J.S.A. 9:6-

8.33).

 N.J.S.A. 9:6-8.21(c)(4) provides that a child is "abused or

neglected" when his or her

 physical, mental, or emotional condition has
 been impaired or is in imminent danger of
 becoming impaired as the result of the failure
 of his [or her] parent or guardian, as herein
 defined, to exercise a minimum degree of care
 (a) in supplying the child with adequate food,
 clothing, shelter, education, medical or
 surgical care though financially able to do
 so or though offered financial or other
 reasonable means to do so, or (b) in providing
 the child with proper supervision or
 guardianship, by unreasonably inflicting or
 allowing to be inflicted harm, or substantial
 risk thereof, . . . or by any other acts of a
 similarly serious nature requiring the aid of
 the court . . . .

 11 A-0156-15T4
A parent "fails to exercise a minimum degree of care when he or

she is aware of the dangers inherent in a situation and fails

adequately to supervise the child or recklessly creates a risk of

serious injury to that child." N.J. Div. of Child Prot. &

Permanency v. E.D.-O., 223 N.J. 166, 179 (2015) (quoting G.S.,

supra, 157 N.J. at 181). Therefore,

 the primary question under Title 9 is whether
 [the child] . . . "ha[d] been impaired" or
 w[ere] in "imminent danger of becoming
 impaired" as a result of [their parent's]
 failure to exercise a minimum degree of care
 by unreasonably inflicting harm or allowing a
 "substantial risk" of harm to be inflicted.

 [A.L., supra, 213 N.J. at 22 (second
 alteration in original) (quoting N.J.S.A. 9:6-
 8.21(c)(4)(b)).]

 "Accordingly, Title 9 initially looks for actual impairment

to the child. . . . [W]hen there is no evidence of actual harm,

the focus shifts to whether there is a threat of harm." E.D.-O.,

supra, 223 N.J. at 178. "[T]he standard is not whether some

potential for harm exists." Id. at 183 (quoting N.J. Dep't of

Youth & Family Servs. v. J.L., 410 N.J. Super. 159, 168-69 (App.

Div. 2009)). "[A] finding of abuse and neglect can be based on

proof of imminent danger and a substantial risk of harm." Id. at

178 (emphasis added) (quoting A.L., supra, 213 N.J. at 23).

 Applying this statutory standard, "something more than

ordinary negligence is required to hold the actor liable." G.S.,

 12 A-0156-15T4
supra, 157 N.J. at 178. Proscribed is "conduct that is grossly

or wantonly negligent, but not necessarily intentional." Ibid.

The standard "implies that a person has acted with reckless

disregard for the safety of others." Id. at 179. However, whether

a particular event is mere negligence, as opposed to gross or

wanton negligence, can be difficult to determine. See N.J. Dep't

of Children & Families v. T.B., 207 N.J. 294, 309 (2011)

(describing the "continuum between actions that are grossly

negligent and those that are merely negligent"). As we recently

explained:

 "[T]he elements of proof are synergistically
 related." [N.J. Div. of Youth & Family Servs.
 v. V.T., 423 N.J. Super. 320, 329 (App. Div.
 2011)] (citation and internal quotation marks
 omitted). In this regard, "[o]ne act may be
 substantial or the sum of many acts may be
 substantial" to prove abuse or neglect. Id.
 at 330 (citation and internal quotation marks
 omitted). A court need not wait until a child
 is actually harmed or neglected before it can
 act to address parental conduct adverse to a
 minor's welfare.

 [S.I., supra, 437 N.J. Super. at 154 (final
 alteration in original).]

 "Strict adherence to the statutory standards . . . is

important because the stakes are high for all parties concerned."

Y.N., supra, 220 N.J. at 179. Consequently, whether a parent has

engaged in acts of abuse or neglect is considered on a case-by-

case basis and must be "analyzed in light of the dangers and risks

 13 A-0156-15T4
associated with the situation," N.J. Dep't of Children & Families

v. R.R., 436 N.J. Super. 53, 58 (App. Div. 2014) (quoting G.S.,

supra, 157 N.J. at 181-82), and evaluated "at the time of the

event that triggered the Division's intervention." E.D.-O.,

supra, 223 N.J. at 170.

 At a fact-finding hearing, N.J.S.A. 9:6-8.44, the Division

must prove abuse or neglect by a preponderance of the evidence,

and "only competent, material and relevant evidence may be

admitted." N.J.S.A. 9:6-8.46(b); see also P.W.R., supra, 205 N.J.

at 32 (holding the State bears the burden to present proofs to

establish abuse or neglect, as defined in the statute); N.J. Div.

of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 24 (App.

Div. 2004) (explaining the State must "demonstrate by a

preponderance of the competent, material and relevant evidence the

probability of present or future harm" to the minor child), certif.

denied, 182 N.J. 426 (2005).

 In cases involving allegations of parental drug abuse, while

courts have recognized "the societal concern that no child come

under the care of an intoxicated parent[,] . . . 'not all instances

of drug ingestion by a parent will serve to substantiate a finding

of abuse or neglect.'" N.J. Div. of Child Prot. & Permanency v.

R.W., 438 N.J. Super. 462, 469-70 (App. Div. 2014) (quoting V.T.,

supra, 423 N.J. Super. at 332). Rather than "filling in missing

 14 A-0156-15T4
information, an understandable response by judges who regularly

witness the evils inflicted on children by their parents' drug

use, judges must engage in a fact-sensitive analysis turning on

'particularized evidence.'" Id. at 470 (quoting A.L., supra, 213

N.J. at 28). So too in cases involving allegations of domestic

violence, "the act of allowing a child to witness domestic violence

does not equate to abuse or neglect of the child in the absence

of additional proofs." N.J. Div. of Youth & Family Servs. v.

I.H.C., 415 N.J. Super. 551, 584 (App. Div. 2010); see also N.J.

Div. of Youth & Family Servs. v. D.F., 377 N.J. Super. 59, 69

(App. Div. 2005) (reversing finding of abuse or neglect based on

domestic violence due to lack of harm to the child.

 Here, we conclude the totality of the evidence in the record

supports Judge DeCastro's conclusion that Carla and Diane abused

or neglected Joey. While exposing a child to an episode of

domestic violence is not enough to substantiate a finding of abuse

or neglect especially where the child exhibited no signs of

distress, see S.S., supra, 372 N.J. Super. at 22-26, Diane's

exposure of Joey to the effects of her drug abuse and her outbursts

of violence subjected the child to a substantial risk of harm.

Specifically, Joey explained to the caseworker, and the caseworker

testified as such, that when his mother was involved in an

altercation with her cousin, he was crying, worried about his

 15 A-0156-15T4
mother, and tried to help her. Indeed, Joey discussed this

violence with his therapist, whose services were required for this

very reason.

 Diane also tested positive on several occasions over a one-

month period when she was serving in the role of an unsupervised

caretaker responsible for Joey – albeit in direct contravention

to the safety protection plan. There were at least two occasions

when Diane had unsupervised contact with Joey within several days

of having a positive drug screen, and both occasions involved

Diane taking Joey somewhere. And, even though Diane now claims

on appeal there were other adults present when Joey was in her

care to ensure his safety, there was no evidence at the fact-

finding hearing that anyone but Diane was supervising Joey. Her

undisputed conduct was sufficient to support the judge's finding

of abuse or neglect.

 The record also provides sufficient evidence to support the

judge's finding of neglect against Carla. The Division introduced

a series of photographs of the home that corroborated and enhanced

the testimony of those witnesses who observed the apartment on

January 14, 2013 and February 14, 2013. Those pictures verify

that the Division workers confronted a situation that posed an

imminent risk of physical harm to the occupants. Specifically,

the rooms and hallways of the home were overflowing with blankets

 16 A-0156-15T4
and bags filled with clothing and other things. There were so

many items hoarded in the home that the kitchen cabinets were

partially blocked from being opened and the hallways were nearly

inaccessible because they were crowded with bags and boxes of

items. The kitchen table and Joey's bed also were piled high with

bags, plastic containers, and other items. The home was also

filled with electronics, construction equipment and paint cans,

ladders, a bicycle, pots and kitchen items, and other refuse.

Carla's permitting her home to become a fire hazard, which she

recognized was a hazard to Joey, was not an "unforeseen peril[]

or accident[, but constituted a] reckless disregard for the

consequences." G.S., supra, 157 N.J. at 178.

 Carla relies on our decision in Doe v. G.D., 146 N.J. Super.

419, 430-31 (App. Div. 1976), aff’d, sub. nom., Doe v. Downey, 74

N.J. 196 (1977), in arguing that abuse or neglect cannot be based

upon a caretaker's "failure to keep the apartment clean . . . ."

Her reliance is misguided as the finding of abuse or neglect was

not based on her failure to keep a clean apartment, but rather was

based on the imminent risk of harm the hoarded items created for

Joey in the event of an emergency. In Doe, the mother of an infant

was charged with abuse or neglect. Id. at 423. Following a fact-

finding hearing, the trial judge found that the child had not

suffered physical injury or abuse, but nevertheless determined

 17 A-0156-15T4
that the child's mental and emotion health were in imminent danger

of being impaired because of the child's substandard and dirty

housing conditions. Id. at 428. On appeal we reversed,

determining that substandard, dirty and inadequate sleeping

conditions "may be unfortunate incidents of poverty," but "do not

establish child neglect or abuse." Id. at 431.

 While the trial court here did not discuss Doe, the hoarding

within Carla's home was not an indication of poverty. There is

no evidence in the record that her home lacked food, running water,

or electricity. Furthermore, Carla's economic status did not

prevent her from removing the piles and bags of clothing from the

home. In fact, she demonstrated an ability to clear the home of

hoarded items as the caseworker noted when she returned to the

home on January 25, 2013. The Division also provided Carla with

services that would help her rid the home of the excessive amount

of hoarded belongings, but she refused these services. In sum,

Carla simply displayed an indifference to the imminent risk of

harm that such deplorable conditions posed for Joey. Accordingly,

the finding of abuse or neglect does not violate the holding in

Doe.

 Carla also ignored the safety protection plan implemented by

the Division and the court orders designed to protect Joey from

the risk of harm to which Diane exposed him. While her permitting

 18 A-0156-15T4
contact with Diane without more did not necessarily give rise to

abuse or neglect, under the totality of the circumstances,

including evidence of Carla's awareness and acknowledgement of the

danger that Diane posed to Joey through her drug abuse and violent

outbursts, and Carla's intentional disregard of that danger,

supported a finding of abuse or neglect. See N.J. Div. of Child

Prot. and Permanency v. J.L.G., ___ N.J. Super. ____, ____ (App.

Div. 2015) (slip op. at 10), aff'd o.b., __ N.J. __ (2017) (finding

the focus in an abuse or neglect determination should be on whether

the guardian "should have . . . prevented" the harm by

"perform[ing] some act to remedy the situation or remove the

danger").

 To the extent we have not specifically addressed any of

Diane's or Carla's remaining arguments, we find them without

sufficient merit to warrant discussion in a written opinion. R.

2:11-3(e)(1)(E).

 Affirmed.

 19 A-0156-15T4