# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4188-16T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

G.G.,

    Defendant-Appellant,

and

A.W. and J.T.L.,

    Defendants.

IN THE MATTER OF J.L., N.G.
and N.G.,

    Minors.

        Submitted April 23, 2018 — Decided July 9, 2018

        Before Judges Sabatino and Rose.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Passaic
        County, Docket No. FN-16-0014-16.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Janet A. Allegro, Designated
        Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Kathryn A. Kolodziej, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Nancy P. Fratz, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant G.G,[1] appeals from an April 27, 2017 Family Part order terminating litigation after a fact-finding hearing that determined he sexually abused or neglected J.L., the thirteen-year-old daughter of his paramour, A.W. Because the court's decision was largely based on inadmissible hearsay statements that were later recanted, we reverse.

I.

We derive the following facts from the record developed at the fact-finding hearing. On May 13, 2015, the Division received a referral from J.T.L., the putative father of J.L., reporting that J.L. said defendant "tried to rape her in February, touched her butt, and tried to kiss her." J.L. also said defendant threatened to kill her if she told anyone and that "nobody wants

---

[1] We use initials to protect the privacy of the parties. See R. 1:38-3(d)(12).

2                                                              A-4188-16T3

to believe [her]." Except for one time shortly before he made the referral, J.T.L. had not seen J.L. in several years.

The next day, the caseworker met with J.L. and pointedly asked if defendant attempted to rape her. J.L. "shook her head in a yes motion." Asked to elaborate, J.L. explained, "one time [defendant] walked inside her bedroom and exposed himself and touched her butt over her clothing and tried to kiss her, but she told him to get out." J.L. said she disclosed that incident to A.W., but her mother did not believe her. J.L. claimed that on another occasion, defendant asked J.L. to expose herself to him, or he would not buy her a new phone. A.W. told the caseworker "she is not dismissing what her daughter is saying, but she knows that either her father or aunt put her up to this, because they have been trying to screw her and [G.G] over for the longest time."

At some point, the Division caseworker learned J.L. did not disclose the allegations directly to J.T.L. Rather, J.L. told her cousin, B.M., who in turn told her mother.[2] Apparently, B.M.'s mother told J.T.L. The caseworker did not interview B.M. or B.M.'s

_____

[2] The record is unclear whether B.M.'s mother was the sister of A.W. or J.T.L.

mother.[3]  The Division referred the case to the Passaic County Prosecutor's Office ("PCPO").

Six days later, a PCPO detective advised the caseworker that J.L. recanted her accusations against defendant.  The PCPO detective and the caseworker then met J.L. at her school.  J.L. indicated to the caseworker that defendant did not touch her or expose himself.  She claimed she made the initial allegations because she disliked defendant and wanted him to leave their home.

A few days later, the Division and the PCPO interviewed defendant.  He denied the allegations and claimed he was never alone with J.L.  The PCPO did not interview B.M. or B.M.'s mother. The PCPO declined to criminally charge defendant.

The Division referred J.L. to the Audrey Hepburn Children's House ("AHCH") for a psychosocial evaluation, which was conducted on June 9, 2015 by Kirsten Byrnes, Psy.D., a staff psychologist. Dr. Byrnes authored a report that was countersigned by her supervising psychologist, Anthony V. D'Urso, Psy.D.

In the sexual abuse assessment portion of her report, Dr. Byrnes noted a "marked change" in J.L.'s demeanor.  In particular,

---

[3] Although B.M. was identified by name in a psychological report furnished to the Division, the caseworker testified at the hearing that she did not know the cousin's name.

"[J.L.] was much less engaged, her mood dampened, she demonstrated ruptured eye contact, preferring instead to look at the couch."

During the interview, J.L. disclosed that, while at their grandmother's home, B.M. asked if defendant "had ever touched her inappropriately, to which [J.L] 'said yeah . . . I wanted him to leave my home.'" However, J.L. again denied defendant had touched her inappropriately, reiterating she told her cousin about the alleged abuse because she wanted defendant out of the house.

In addition to interviewing J.L., Dr. Byrnes interviewed the caseworker and A.W. Dr. Byrnes did not interview B.M. or B.M.'s mother. Dr. Byrnes concluded "sexual abuse is clinically supported and [J.L.'s] statement should be perceived as a recantation rather than false allegation[]."

On July 9, 2015, the Division filed a verified complaint and order to show cause against defendant, seeking care and supervision of J.L. and defendant's three-year-old twin daughters with A.W.[4] The judge interviewed J.L.[5] in camera, but in the presence of her law guardian. J.L. told the judge she had lied about the

---

[4] The complaint named A.W. and J.T.L. for dispositional purposes. As such, they are not parties to this appeal. Although the twins also were named in the complaint, they were not part of the abuse and neglect finding. Their law guardian filed a letter brief taking no position regarding this appeal.

[5] J.L. was fourteen years old when she testified.

allegations against defendant "[s]o he could just leave and get away from [her]." The judge indicated he did not interview J.L. long enough to determine whether or not she had lied when disclosing the allegations against defendant. The judge granted the Division's application.

A fact-finding hearing was conducted on three non-consecutive days in March, April and June 2016 before another judge. The Division presented J.L.'s statements through the testimony of the caseworker and sought to corroborate them through the testimony of Dr. D'Urso. Defendant and J.L. did not testify, nor call any witnesses. The Division entered into evidence, without objection, documents, including its summary reports and Dr. Byrnes' psychosocial report. The law guardian entered into evidence therapy reports regarding J.L. and the draft psychosocial report, which differed in some respects, including the clinical impression, from the report introduced by the Division.

Before Dr. D'Urso testified, defendant and the law guardian objected to his testifying about the contents of the psychosocial report prepared by Dr. Byrnes, in particular, because Dr. D'Urso did not observe J.L. They also objected to "the failure to notify J.L. of the true purpose of the evaluation: to determine whether she was actually sexually abused or not." Following voir dire, the trial judge qualified Dr. D'Urso as an expert "with respect

to issues of child sexual abuse, and specifically the clinical signs of child sexual abuse."

At the outset of his testimony, Dr. D'Urso described the "team approach" employed at AHCH:

> So, we have in our center[,] triage conducted by nurses for the appropriateness of evaluations and to establish questions that we can answer from either a medical or psychological perspective. Once those evaluations are reviewed by myself, or . . . [the] medical director, the evaluations are scheduled, clinicians are assigned, we have an early morning meeting to go over referral questions to make sure everybody is clear about what we [are] answering. They then conduct the evaluations, and on a weekly basis we have rounds. At the end of the evaluation period we go over the assessments. The clinicians then provide reports, the clinicians and I go over those reports, and then those reports are finalized, sent out.
>
> . . . .
>
> So, we have standardized protocols relative to questions, inquiries during the psychological assessments. We have them for adults, we have them for kids. And so the evaluation is meant to cover a series of areas, not only general history and background and developmental functioning, but also specific functioning relative to the allegations, in this case . . . allegations of sexual abuse. . . .

Apparently, after Dr. Byrnes met with J.L., she reviewed her findings with Dr. D'Urso and they finalized her report. Dr. D'Urso

7

agreed with Dr. Byrnes' conclusion that inappropriate sexual boundaries or contact was clinically supported.

To support his findings, Dr. D'Urso testified that J.L. disclosed "information of discomfort"; lacked A.W.'s support; was confronted by defendant; and felt responsible for reporting the abuse. Further, J.L. "was [not] a particularly sophisticated child[;] . . . she was [not] engaging in Conduct Disorder or any antisocial behavior or any sophisticated methods of lying."

Dr. D'Urso determined J.L.'s initial allegations were consistent and detailed, and the disclosure to her cousin on the playground was "not a purposeful disclosure." In this regard, he testified that

> the tipping point was that we saw this not as a false allegation where she was able to manipulate people or she did [not] have that kind of background necessarily. All kids certainly tell non-truths, but to come up with this entire story, to be on a playground, or be crying, have her cousin come to her . . . it seemed like a pretty far plot.

Dr. D'Urso also cited the observations Dr. Byrnes made during the interview. He noted the change in J.L.'s demeanor when the topic turned to the sexual assault allegations. Specifically, J.L. became withdrawn, whereas she was upbeat and forthright on other topics. He conceded on cross-examination, however, that the

"sexualized topic" of conversation might have caused that change in demeanor.

Ultimately, Dr. D'Urso agreed with Dr. Byrnes that J.L.'s subsequent denial of the allegations was a recantation and the original disclosure was not a false statement. Dr. D'Urso explained a recantation is "a phenomen[on] that happens in child abuse cases, when kids make allegations about abuse that are true . . . and take back those allegations."

Following closing arguments on June 17, 2016, the trial judge commenced his oral decision, summarizing the legal principles and testimony. Among other things, he noted his concerns about the caseworker's interviewing techniques, "introduc[ing] the concept of rape." Specifically, "we have a child who was interviewed by a caseworker, who asked in essence whether it was true that she was raped." The judge also was concerned that J.L. "after having given a statement supporting the sexual contact and the inappropriate exposure then recanted the testimony." Shortly thereafter, he reserved decision.

On June 23, 2016, the judge continued his oral decision. He found credible the testimony of the caseworker and Dr. D'Urso. The judge acknowledged Dr. D'Urso did not interview J.L., nor had he ever met her, and "that should be grounds for discrediting or giving sufficiently light weight to the report." However, the

judge was persuaded by the protocol in place at AHCH, including the "team approach" as explained by Dr. D'Urso. He also discounted discrepancies in the report regarding the lack of interviews of J.L.'s relatives, ultimately finding the report "credible and weighty . . . corroborating . . . the clinician's conclusion that this is a case involving inappropriate boundaries and contact."

In sum, the trial court found the Division proved, by a preponderance of the evidence, that J.L. was abused or neglected, pursuant to N.J.S.A. 9:6-8.21(c)(3) and (4)(b), through "the child['s] statements, in conjunction with the [AHCH] report." This appeal followed.

## II.

On appeal, defendant contends the trial court's decision was not supported by sufficient, credible evidence. Defendant primarily claims the trial court abused its discretion by finding J.L.'s statements were sufficiently corroborated by Dr. D'Urso. In her merits brief, the law guardian joined defendant in urging us to reverse the trial court's finding of abuse or neglect.

Following our decision in <u>New Jersey Division of Child Protection and Permanency v. N.B.</u>, 452 N.J. Super. 513 (App. Div.

2017), defendant filed a letter brief, pursuant to Rule 2:6-11(d).[6] Defendant cites N.B. for our observation that "[o]ur courts have rejected the concept that mental health professionals may opine about the trustworthiness of a child's hearsay statements." Id. at 523 (citation omitted). Defendant claims that concept applies with equal force, here, where the trial court inappropriately relied on Dr. D'Urso's "unsupported belief" that J.L.'s recantation "was not a true denial."

In its responding letter, the Division attempts to distinguish N.B., arguing the supervising psychologist did not opine about the trustworthiness of J.L.'s statements. Instead, he was "offered as an expert to explain why the [AHCH] team found that the child's statements of sexual abuse were clinically supported." The Division also argues that the findings of the supervising psychologist were based on clinical support, including her "change in affect when speaking about the conduct."

---

[6] Rule 2:6-11(d) provides in pertinent part that "A party may . . . without leave, serve and file a letter calling to the court's attention, with a brief indication of their significance, relevant published opinions issued . . . subsequent to the filing of the brief."

After consulting with J.L.[7] on April 18, 2018, the law guardian changed her position and moved to withdraw her initial brief and file a substituted brief. We granted the motion.

On April 19, 2018, the law guardian responded to defendant's Rule 2:6-11(d) letter, now contending J.L.'s statements were sufficiently corroborated by substantial evidence "and more than mere consistency" to satisfy N.B. In her April 25, 2018 substituted brief, other than summarizing the facts and procedural history, the law guardian "makes no further legal argument after consultation with the minor child. The family is reunified, and all look forward to closure. [J.L.] begs this court that regardless of whether the judgment under review is affirmed or reversed, that the litigation not be remanded and reopened."

### III.

We begin our analysis of the legal issues raised on appeal by reaffirming the applicable standard of review. Generally, our review of the trial judge's decision is limited. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). "To the extent the appellate issues concern a trial court's findings of fact or credibility determinations, we accord substantial deference and defer to the factual findings of the Family Part if

---

[7] J.L. was seventeen years old at the time of the consultation.

they are sustained by 'adequate, substantial, and credible evidence' in the record." N.B., 452 N.J. Super. at 521 (quoting R.G., 217 N.J. at 552).

Here, the trial court based its abuse or neglect finding, in part, on J.L.'s initial allegations that defendant sexually abused her when she was thirteen years old. The court also found Dr. Byrnes' psychosocial report corroborated J.L.'s statements pursuant to N.J.S.A. 9:6-8.46(a)(4).

Where, as here, "the trial court's rulings 'essentially involved the application of legal principles and did not turn upon contested issues of witness credibility' we review the court's corroboration determination de novo." N.J. Div. of Child Prot. & Permanency v. A.D., ___ N.J. Super. ___, ___ (App. Div. 2018) (slip op. at 11) (quoting N.B., 452 N.J. Super. at 521) (conducting a de novo review of the trial court's determination whether a child's statements were corroborated pursuant to N.J.S.A. 9:6-8.46(a)(4)).[8] Accordingly, we owe no deference to the trial court's "interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

---

[8] While the trial court did not have the benefit of our decisions in N.B. and A.D., these cases clarified legal principles but did not enunciate a new rule of law. See State v. Afanador, 151 N.J. 51, 57 (1997).

Abuse and neglect cases are fact sensitive and "[e]ach case requires careful, individual scrutiny" as many cases are "idiosyncratic."  N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 33 (2011).  In a Title 9 action, the Division must prove by a preponderance of "competent, material and relevant evidence" that a child is abused or neglected.  N.J.S.A. 9:6-8.46(b).  In making that determination, the court should base its decision on the totality of the circumstances.  N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011).

Pertinent to this appeal, where the trial court found J.L. was abused or neglected pursuant to N.J.S.A. 9:6-8.21(c)(3) and (4)(b), an "abused or neglected child" finding is appropriate if a parent or guardian:

> (3) commits or allows to be committed an act of sexual abuse against the child; (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined,[9] to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a

---

[9] N.J.S.A. 9:6-8.21(a) provides, in pertinent part, a "[p]arent or guardian" means "any . . . paramour of a parent, or any person, who has assumed responsibility for the care, custody, or control of a child or upon whom there is a legal duty for such care."

similarly serious nature requiring the aid of the court[.]

Pursuant to N.J.S.A. 9:6-8.46(a)(4), an uncorroborated statement of sexual abuse by a child is admissible in an abuse or neglect proceeding. However, "an uncorroborated statement . . . is not alone 'sufficient to make a fact finding of abuse or neglect.'" N.J. Div. of Child Prot. & Permanency v. J.A., 436 N.J. Super. 61, 66-67 (App. Div. 2014) (quoting N.J.S.A. 9:6-8.46(a)(4)). "Stated another way, 'a child's hearsay statement may be admitted into evidence, but may not be the sole basis for a finding of abuse or neglect.'" Id. at 67 (quoting P.W.R., 205 N.J. at 33). Corroborative evidence is therefore required. Ibid.

"The most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence." N.J. Div. of Youth & Family Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003). We have also recognized, "Such evidence has included a child victim's precocious knowledge of sexual activity, a semen stain on a child's blanket, a child's nightmares and psychological evidence." N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002) (emphasis added) (citation omitted).

Expert witnesses may testify about facts or data that inform their analyses and opinions, as long as that information is "of a

type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]" N.J.R.E. 703. An expert witness need not have personal, first-hand knowledge of a case. "Indeed, an expert's testimony may be based on the work done or even hearsay evidence of another expert, particularly when, as here, the latter's work is supervised by the former." State v. Dishon, 297 N.J. Super. 254, 281 (App. Div. 1997); accord State v. Stevens, 136 N.J. Super. 262, 264 (App. Div. 1975).

As previously stated, however, "mental health professionals may [not] opine about the trustworthiness of a child's hearsay statements." N.B., 452 N.J. Super. at 523 (citing State v. J.Q., 130 N.J. 554, 582-83 (1993)). Pursuant to N.J.R.E. 803(c)(6), hearsay statements of opinions and diagnoses are further subject to N.J.R.E. 808, which states, in pertinent part:

> Expert opinion which is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness unless the trial judge finds that the circumstances involved in rendering the opinion, including . . . the complexity of the subject matter, and the likelihood of accuracy of the opinion, tend to establish its trustworthiness.

However, "The evidence must be independently admissible for a court to deem it corroborative of a child's statement." A.D., (slip op. at 12) (citing N.B., 452 N.J. Super. at 524-26).

16

Here, Dr. D'Urso testified that he based his expert opinion on the Division's screening summary, AHCH's intake form completed by the Division caseworker, "collateral contacts" with the caseworker and A.W., and Dr. Byrnes' clinical evaluation of J.L. Dr. D'Urso also reviewed and approved the psychosocial evaluation authored by Dr. Byrnes whom he supervised at AHCH. Because he was duly qualified as an expert witness by the trial judge, and supervised Dr. Byrnes in this matter, we find no error in Dr. D'Urso's testifying about the facts contained in Dr. Byrnes' written reports. See N.J.R.E. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.").

We part company with the trial judge, however, in permitting Dr. D'Urso to testify about Dr. Byrnes' findings concerning J.L.'s change in demeanor during the sexual abuse assessment of her evaluation. Dr. D'Urso did not observe J.L. during the evaluation. Nor is there any indication in the record that Dr. Byrnes disclosed to Dr. D'Urso her specific line of questioning that prompted J.L.'s change in demeanor. Because the report does not cite Dr. Byrnes' inquiry in question and answer format, it is unclear whether J.L.'s affect changed when the topic of sex was raised by Dr. Byrnes, generally, or specifically as to J.L.'s allegations against

17

defendant. As Dr. D'Urso candidly admitted, J.L.'s change in demeanor could have been prompted merely by Dr. Byrnes' switching the topic of discussion to sex. Similarly, the report does not describe J.L.'s affect when she acknowledged the allegations against defendant compared with her demeanor when she denied the abuse to Dr. Byrnes.

Because Dr. D'Urso was not present during the interview of J.L., "the likelihood of accuracy of the opinion" concerning J.L.'s change in demeanor is not trustworthy. N.J.R.E. 808. As the trial judge aptly observed, Dr. D'Urso did not evaluate J.L., nor did he meet her. While, pursuant to N.J.R.E. 702, Dr. D'Urso was permitted to testify about the facts contained in the AHCH report, his opinion about whether her recantation was truthful was improper. N.B., 452 N.J. Super. at 523. Thus, in this particular case, the Division should have called Dr. Byrnes, instead of Dr. D'Urso, to testify specifically about how and when J.L.'s demeanor shifted during the interview.

Moreover, based on our de novo review of the record, we discern no other "psychological evidence" corroborating J.L.'s allegations. Z.P.R., 351 N.J. Super. at 436. As Dr. Byrnes observed, "There was no evidence of suicidal ideation or psychotic processes." J.L. "denied any experiences of enuresis, nightmares, auditory or visual hallucinations, suicidal ideation or ever

A-4188-16T3

engaging in self-harming behaviors." She denied using substances and also "earns As and Bs" in school. See N.B., 452 N.J. Super. at 522. Further, J.L. consistently denied the allegations after her initial disclosure.

Without behavioral corroboration, Dr. D'Urso's remaining findings supporting his opinion that J.L.'s recantation was false either impermissibly opine about her trustworthiness, or are not supported by the record. Although we recognize Dr. D'Urso was qualified by the court as an expert in "the clinical signs of child sexual abuse," his finding, in part, that J.L. did not engage in "any sophisticated methods of lying" transgressed from a clinical finding to "truth-telling." See J.Q., 130 N.J. at 582. Nor are we persuaded by his finding that J.L.'s initial disclosure was consistent. See N.B., 452 N.J. Super. at 523 (recognizing "consistency alone does not constitute corroboration" pursuant to N.J.S.A. 9:6-8.46(a)(4)).

Further, it is unclear from the record whether J.L. spontaneously disclosed the allegations to B.M. in the playground when B.M. found her crying, or whether B.M. directly asked J.L., when they were at their grandmother's home, if defendant had touched her. Although the location of disclosure is not dispositive, both accounts were contained in Dr. Byrnes' report. Yet, Dr. D'Urso found, as a reason to support his opinion that the

recantation was false, "her cousin asked her a broad question, and she answered with specific responses." His finding, however, is inconsistent with one version of J.L.'s disclosure.[10] Moreover, he mistakenly believed B.M. had been interviewed.

We also find disconcerting that none of the investigating authorities, i.e., the Division, the PCPO, and AHCH, interviewed B.M., the first person to whom J.L. reported the allegations. See State v. R.K., 220 N.J. 444, 455 (2015) (recognizing, the fresh-complaint doctrine "allows the admission of evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated"). Although the PCPO determined rather quickly it would not prosecute defendant, the statement of B.M. may have assisted the Division and AHCH in its evaluation and assessment of J.L., and may have corroborated J.L.'s statement pursuant to N.J.S.A. 9:6-8.46(a)(4). See also Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 4 on N.J.R.E. 607 (2018) (permitting fresh complaint testimony to support the credibility of a witness).

---

[10] We find troubling, as did the trial judge, the method of inquiry employed by the caseworker when initially questioning J.L. See State v. Michaels, 264 N.J. Super. 579, 622 (App. Div. 1993) (recognizing, in child sexual assault investigations, "the possibility of distorting recollections by suggestive or leading questions").

In sum, we are constrained to find J.L.'s statements were not sufficiently corroborated, and as such, the trial court's determination that defendant abused or neglected J.L. "was not sufficiently supported by competent, admissible evidence." N.B., 452 N.J. Super. at 527. In light of our ruling, we need not reach defendant's remaining claims. Accordingly, we vacate the June 23, 2016 order, and direct the Division to remove defendant's name from the Child Abuse Registry, regarding this incident, within thirty days.

Reversed and remanded for the sole purpose of carrying out the directives of this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION