# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1851-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

B.N.,

      Defendant-Appellant,

and

A.V.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF I.N.,

      a Minor.

_____

Submitted October 3, 2019 – Decided November 13, 2019

Before Judges Nugent and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0234-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Christine Olexa Saginor, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Julie Beth Colonna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Joseph Hector Ruiz, Designated Counsel, on the brief).

PER CURIAM

Defendant, B.N., the twenty-two-year-old mother of I.N., now age two, appeals from a judgment terminating her parental rights to the child.[1] B.N. has a younger child who is not involved in this action. I.N.'s father, A.V., voluntarily surrendered his parental rights on the day the guardianship trial began, and the court dismissed the complaint as to him. B.N. argues that plaintiff, Division of Child Protection and Permanency (Division), failed to prove by clear and convincing evidence that terminating her parental rights was in the child's best interests, under the standards codified in N.J.S.A. 30:4C-

---

[1] We use initials to protect the parties' privacy. R. 1:38-3(d).

15.1(a).  The Division and the Law Guardian oppose the appeal.  Having studied the record, found the trial court's findings of fact supported by ample credible evidence, and determined the court's legal analysis to be sound, we affirm.

When the Division seeks to terminate a parent's constitutionally protected, fundamental liberty interest in the care, custody, and supervision of a child, Santosky v. Kramer, 455 U.S. 745, 753 (1982), it must clearly and convincingly prove, and a court must determine, that terminating parental rights is in the child's best interests.  In a Title 30 proceeding, the "best interests" standard requires the Division to prove by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
> (4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

Here, to prove the statutory criteria, the Division presented the testimony of three witnesses: Edelly Polanco, one of its Family Service Specialists and Adoption Caseworkers; Dr. Samiris Sostre, an expert in psychiatry; and Dr. Robert Miller, an expert in forensic psychology. Polanco testified the Division responded to an April 10, 2017 referral by interviewing B.N. after she left Isaiah House, the place the Division had previously arranged for her to live and get appropriate support. B.N. had packed her belongings and left with I.N. When interviewed, B.N. admitted that she felt overwhelmed and felt like she could not parent I.N. She acknowledged she was bipolar, suffered from ADHD, and had anger issues. She also admitted smoking marijuana throughout her pregnancy with I.N. and continuing to smoke marijuana. Nonetheless, B.N. said she was "open for services," so allegations of neglect were not established.

Based on its investigation, however, the Division executed an emergency removal of I.N. and the court granted the Division's application for care, custody, and supervision.[2] The Division placed two-month-old I.N. with the

---

[2] An emergency removal, commonly known as a "Dodd removal," refers to the emergency removal of a child from the home without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

resource mother with whom she currently resides, with whom I.N. is thriving, and by whom I.N. will be adopted.

Between I.N.'s emergency removal from B.N. in April 2017 and the guardianship trial in December 2018, the Division attempted on many occasions to provide services to help B.N. Initially, B.N. underwent psychological and psychiatric evaluations. The psychologist recommended she engage in individual trauma-based therapy. The psychiatrist recommended she attend individual therapy and anger management therapy, attend parenting classes, and consider taking psychotropic medications. He also recommended she engage in a "Mommy and Me" program. The Division attempted to provide the services the doctors recommended. It also referred B.N. to therapeutic supervised visitation.

For the most part, B.N. refused to participate in services. She became very upset with the Division for recommending the Mommy and Me program, was not interested in attending, and told the Division to take away her visitation because she did not want it anymore. Although B.N. did not stop attending visits with I.N., she did not visit the baby on a consistent basis, despite the Division's continuing encouragement of her to visit I.N.

A-1851-18T3

In June 2017, the Division responded to a referral that B.N. had threatened to strangle I.N. B.N. denied making the threat but admitted to underage drinking. She was nineteen years old. She told the Division she was open for services. The Division determined that the allegation of abuse was unfounded.

When B.N. failed to attend therapeutic visitation through Catholic Charities, the Division referred her to therapeutic visitation through Urban League. The Division also arranged for her to begin individual therapy and anger management. She declined to do so. She denied needing individual therapy and she did not attend the parenting classes the Division had arranged.

In September 2017, B.N. agreed to attend a Mommy and Me program. Although she showed up for intake and was accepted into the program, she left without explanation three days later. The Division also referred B.N. to a program called ACES, an acronym for Academic and Career Exploration Services, to assist her in getting her GED. In addition, the Division referred B.N. to an in-parent support service, helped her submit an application to the Division of Developmental Disability for additional services, and referred her to a program for victims of human trafficking. Although she attended the latter program and participated in anger management sessions, she never attended any

6

individual therapy or parenting sessions. She declined services from the Division of Developmental Disability and refused to fill out an application.

In November 2017, B.N. began to participate in a Mommy and Me program because she was pregnant and wanted to keep the child. After B.N. gave birth to her second child, the Division arranged for B.N. to have supervised visits with I.N. at the Mommy and Me program where B.N. was residing with her newborn. Notwithstanding the Division's efforts, B.N. routinely missed scheduled supervised visits with I.N. She did, however, receive some job training, attend some group sessions, and learn "baby care basics" at the Mommy and Me program. Meanwhile, the Division again arranged for B.N. to visit I.N., this time through Family Intervention Services. B.N.'s participation was sporadic, and program personnel closed her case in September 2018 due to "a lack of consistency, a lack of compliance, no-shows, and no participation." Three months earlier, she had been discharged from the Mommy and Me program for noncompliance, namely, exceeding the time she was permitted to be out of the facility overnight.

From June through August 2018, B.N. lived in Jersey City, where the Division had found housing for her. She was discharged from the residence for violating their overnight visitor policy and for possessing marijuana. Thereafter,

7                                                     A-1851-18T3

the Division found housing for her through Hudson Welfare Services. During that time, her pattern of noncompliance with programs the Division arranged continued. She either did not attend or did not complete the programs. In addition, B.N. continued to smoke marijuana, claiming it helped her to control her moods. In September, after receiving a warning about compliance with the rules of the facility where she was residing, B.N. left the residential program. She moved to Pennsylvania and has not returned to New Jersey. When the trial took place in December 2018, B.N. was not receiving any services, though the Division had arranged for transportation for B.N. so that she could keep necessary appointments in New Jersey.

In addition to providing an array of services, the Division assessed a number of B.N.'s friends and relatives for placement of I.N. These included her maternal uncle, maternal aunt, A.V.'s uncle, and B.N.'s maternal third cousin. The Division investigated and ruled out all of them. None appealed the Division's decision. The Division was reassessing B.N.'s maternal third cousin at the time of the guardianship trial.

Polanco concluded her testimony by reiterating that since I.N. was removed from B.N.'s care, B.N. had completed none of the Division-provided or court-ordered services and had never visited I.N. on a consistent basis.

Dr. Sostre, the Division's expert in psychiatry, examined B.N. when I.N. was one and one-half years old. B.N had given birth to her second child. The doctor explained B.N. had a history of mental illness dating back to early adolescence and included a diagnosis of bipolar disorder and one suicide attempt. She was not currently receiving treatment for the mental illness that plagued her; instead, she was using marijuana to manage her anger and anxiety. She did not want therapy and did not wish to discuss her past.

B.N. acknowledged she should be taking some type of psychiatric medication but refused because she feared the side effects. She told Dr. Sostre she was not sleeping, thought she was depressed, and had mood swings sufficiently severe to convince her she suffered from bipolar disorder. She was aware she had a problem controlling her anger, knew her relationships had been unstable, and knew she had difficulty maintaining stable housing.

Dr. Sostre diagnosed B.N. with borderline personality disorder—often confused with bipolar disorder—and post-traumatic stress disorder (PTSD). Borderline personality disorder manifests in pervasive maladaptive patterns of behavior and multiple daily mood swings. Marijuana helps stabilize the mood swings. Affective instability, poor impulse control, and interpersonal chaotic

relationships are typical. B.N. was exhibiting these symptoms when the doctor examined her.

Dr. Sostre believed the PTSD, marked by a patient's difficulty facing past trauma, was playing a role in B.N.'s refusal to accept services to address it. According to the doctor, because B.N.'s insight was very poor, she did not realize how her past was impacting her present, which played a role in her refusal to accept services to address her problem. Although Dr. Sostre believed medication would stabilize B.N.'s moods, and believed her self-medicating with marijuana was inappropriate and affected her judgment, the doctor was unable to convince B.N. to start either medication or psychotherapy, the latter being "the most important piece."

In view of B.N.'s refusal to accept professional help, her prognosis for change was poor. Because her prognosis for change was poor, and in view of her youth, immaturity, impulsive behavior, inability to make adequate decisions, and self-centeredness, her needs would come before I.N.'s needs, which placed I.N. at risk.

Dr. Miller, the Division's expert psychologist, examined B.N. three times, saw her on a fourth occasion, and conducted bonding evaluations. According to him, she had a history of abusing marijuana and alcohol. He recounted B.N.'s

extensive history of trauma, which "explains a lot about why she is unable to parent." Dr. Miller diagnosed B.N. with "severe mental illness, . . . depression, post-traumatic stress disorder, and substance abuse." He added that B.N. also suffered from "a personality history that's characterized by impulsivity, anger, aggression, and denial of her problems."

Dr. Miller provided B.N. with a "very transparent Adolescent Parenting Inventory, which . . . lists the ways people think about parenting." He testified the results "raise[] significant concerns regarding [B.N. and], her role-reversing tendency, which means she will use her child to soothe her, as opposed to placing her own needs aside to focus on the child's emotional needs." The doctor diagnosed B.N. with post-traumatic stress disorder, which provided her "with a pathway to getting some help." Although he recommended B.N. begin treatment with a trauma-focused cognitive behavioral therapy, and though she was initially open to treatment, she ultimately received none.

Dr. Miller opined that B.N.'s ability to parent I.N. was poor. Absent treatment, she would be unable to recognize emotions in a child, especially a nonverbal infant. Consequently, "[s]he will become increasingly agitated and triggered when children enter a toddler phase because children are seeking some normal autonomy." The doctor explained that if B.N. is "disinhibited by alcohol

11

abuse, the child can be harmed." Her prognosis for change was "guarded and poor."

Dr. Miller noted B.N. had no plan for parenting I.N. He believed she was letting I.N. go to focus on her newer child. In his opinion, B.N. was unable to safely parent I.N. B.N. was "demonstrating a pattern of pathological parenting that's likely to cause harm or significant risk of harm."

Dr. Miller conducted bonding evaluations for the resource mother and B.N. During B.N.'s interaction with I.N., she became increasingly frustrated when she could not redirect or engage the child, "who remained emotionally constrained, shutdown, lacking vocalization." In the doctor's opinion, no emotional bond existed between B.N. and I.N. No bond or attachment ever developed.

In contrast, I.N. had developed a secure attachment with the resource mother. The resource mother had become I.N.'s psychological parent. Dr. Miller explained that during the time I.N. had been in the care of the resource mother, the attachment process had "gone forward normally and naturally as you would expect and has resulted in an enduring emotional bond." The doctor had no concern about the resource mother's ability to meet I.N.'s needs. The resource mother was committed to adopting I.N.

Dr. Miller testified that removing I.N. from the resource mother's care would cause immediate and enduring harm to the child; the child would not be able to overcome it; and the loss would be catastrophic. B.N. could not ameliorate the harm because she is incapable of responding to or recognizing a child's emotional needs. Terminating B.N.'s parental rights would have no effect on I.N. as the child had no emotional bond with B.N. The doctor emphasized that I.N. needs permanency to be able to move forward psychologically.

B.N. presented no testimony. Based on the Division's evidence, Judge Bernadette N. DeCastro concluded the Division had clearly and convincingly proven the four statutory criteria of the best interests of the child test set forth in N.J.S.A. 30:4C-15.1(a). The judge terminated B.N.'s parental rights to I.N.

On appeal, B.N. raises four arguments, which she presents in the following points:

> THE TRIAL COURT INCORRECTLY APPLIED THE LEGAL PRINCIPLES GOVERNING TERMINATION OF PARENTAL RIGHTS MATTERS TO THE FACTS. THE RECORD DOES NOT SUPPORT THOSE VERY PRECISE STANDARDS AND THEREFORE TERMINATION OF B.N.'S RIGHTS SHOULD BE REVERSED.
>
> POINT I
> THE TRIAL COURT ERRED IN CONCLUDING THAT B.N. HARMED [I.N.] OR EXPOSED HER TO A SUBSTANTIAL RISK OF HARM.

POINT II
THE TRIAL COURT ERRED IN CONCLUDING
THAT B.N. WAS UNWILLING OR UNABLE TO
ELIMINATE ANY PERCEIVED HARM TO HER
CHILD.

POINT III
THE TRIAL COURT FAILED TO PROPERLY
CONSIDER ALTERNATIVES TO TERMINATION
OF PARENTAL RIGHTS.

POINT IV
THE TRIAL COURT ERRED IN CONCLUDING
THAT TERMINATION OF B.N.'S PARENTAL
RIGHTS IS IN THE CHILD'S BEST INTERESTS.

Having considered B.N.'s arguments in light of the record and applicable legal principles, we affirm, substantially for the reasons expressed by Judge DeCastro in her written opinion. B.N.'s arguments are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E). We add only these comments.

The four statutory criteria of the best interests of the child test set forth in N.J.S.A. 30:4C-15.1(a) "are not discrete and separate, but relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 506 (2004)).

When we review a trial court's determination that the Division either has or has not satisfied the statutory criteria, we must defer to the court's factual findings unless they "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). So long as "they are 'supported by adequate, substantial and credible evidence,'" such factual findings will not be disturbed on appeal. In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 483-84 (1974)). Moreover, we owe deference to a trial court's expertise in handling family cases. Cesare v. Cesare, 154 N.J. 394, 411-13 (1998).

Here, we conclude the trial judge's factual findings are based on sufficient credible evidence, and in light of those findings, her legal conclusions are unassailable. The record amply supports her decision that the termination of parental rights is in I.N.'s best interests.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1851-18T3