# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0364-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

D.D.,

     Defendant-Appellant,

and

J.M.,

Defendant.

_____

IN THE MATTER OF S.M.,
a minor.

_____

Submitted December 16, 2021 – Decided January 31, 2022

Before Judges Mawla and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, FN-03-0113-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Richard Foster, Assistant Deputy Public Defender, of counsel and on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Meaghan Goulding, Deputy Attorney General, on the brief).

PER CURIAM

In this Title Nine case, defendant D.D. (Dana)[1] appeals from a March 28, 2017 order finding that she abused or neglected her eldest daughter – S.M. (Sasha) – by allowing the child's stepfather to return to the home after the Division of Child Protection and Permanency (Division) substantiated allegations that he had sexually abused S.M. pursuant to N.J.S.A. 9:6-8.21(c).[2] We affirm.

On appeal, Dana raises the following arguments:

---

[1] We use fictious names to protect the privacy interests of the parties and confidentiality of the record. R. 1:38-3(d)(12).

[2] D.J. (Derrick) did not participate in the underlying litigation and is not appealing the Title Nine finding against him.

A-0364-20

POINT I

REVERSAL OF THE TRIAL COURT'S ABUSE AND NEGLECT ADJUDICATION AGAINST [DANA] IS WARRANTED AS A MATTER OF LAW, BECAUSE THE TRIAL COURT ERRED IN ITS APPLICATION OF THE LAW REGARDING CORROBORATION OF THE CHILD'S OUT-OF-COURT ALLEGATIONS.

A. The Court Erred In Holding That Corroboration Was Provided By [Sasha's] Supposedly Consistent Repetition Of Her Allegations.

B. The Court Erred In Holding That Corroboration Of [Sasha's] March 2016 Sexual Abuse Allegations Was Provided by [Dana's] Admission That She Allowed [Derrick] To Come To The Home To Visit His Children In November 2016.

C. The Court Erred In Holding That Corroboration Of [Sasha's] Sexual Abuse Allegations Was Provided By "Medical And Scientific Evidence," As There Was No Such Evidence In The Record.

POINT II

THE COURT ERRED IN BASING ITS ABUSE AND NEGLECT JUDGMENT IN SUBSTANTIAL PART UPON THE CHILD ABUSE PEDIATRICIAN'S TESTIMONY AS BOTH EXPERT WITNESS AND LAY WITNESS, AS THE EXPERT TESTIMONY WAS WITHOUT PROPER MEDICAL/SCIENTIFIC BASIS AND THE LAY OPINION TESTIMONY WAS NOT EXCLUSIVELY RELIANT ON PERSONAL KNOWLEDGE.

POINT III

UNDER THE TOTALITY OF THE CIRCUMSTANCES IN THIS CASE, THE TRIAL COURT DENIED [DANA] THE LEVEL OF DUE PROCESS AND "FUNDAMENTAL FAIRNESS" THAT NEW JERSEY LAW REQUIRES IN [DIVISION] MATTERS BY ITS COMPLETE RELIANCE ON THE [DIVISION] WORKER'S WRITTEN DESCRIPTION OF, AND TESTIMONY ABOUT, [SASHA'S] PROSECUTOR INTERVIEW INSTEAD OF DIRECTLY VIEWING VIDEO OF THE INTERVIEW, OR TAKING TESTIMONY FROM [SASHA] IN CAMERA, ESPECIALLY GIVEN THE FAILURE OF [THE DIVISION] TO PRESENT THE INTERVIEWING DETECTIVE AS A WITNESS OR TO PRESENT ANY PSYCHOLOGICAL EVIDENCE REGARDING THE ALLEGED CAUSES OF [SASHA'S] DISTRESS.

POINT IV

THE TRIAL COURT'S FINDING THAT [DANA] "KNEW" IN NOVEMBER 2016 THAT [SASHA] HAD BEEN SEXUALLY ASSAULTED BY [DERRICK] WAS CONJECTURE, WITHOUT SUPPORTING EVIDENCE IN THE RECORD, AND THE RESULTING DETERMINATION THAT [DANA] WILLINGLY HARMED [SASHA] AND PUT HER AT RISK BY ALLOWING [DERRICK] IN THE HOME MUST BE REVERSED.

POINT V

REGARDLESS OF WHETHER THIS COURT CAN AFFIRM THE TRIAL COURT'S DETERMINATION THAT [DERRICK] SEXUALLY ABUSED [SASHA],

4

IT SHOULD NEVERTHELESS REVERSE THE DETERMINATION THAT [DANA'S] ACTS AND OMISSIONS CONSTITUTED TITLE [NINE] ABUSE AND NEGLECT OF [SASHA], BASED ON [THE DIVISION'S] FAILURE TO PRESENT PARTICULARIZED EVIDENCE OF HOW THE PARENTAL BEHAVIORS HARMED [SASHA], OR PUT HER IN IMMINENT DANGER AND AT SUBSTANTIAL RISK OF HARM.

Our review of the Family Part's abuse or neglect finding is limited. N.J. Div. of Youth & Fam. Servs. v. S.H., 439 N.J. Super. 137, 144 (App. Div. 2015). We must determine whether the decision "is supported by 'substantial and credible evidence' on the record." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007)). We defer to the Family Part's factual findings because that court "has the superior ability to gauge the credibility of the witnesses . . . and because it possesses special expertise in matters related to the family." Ibid. A family court's decision should not be overturned unless it went "so 'wide of the mark'" that reversal is needed "to correct an injustice." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). The court's interpretation of the law or its legal conclusions are reviewed de novo. State ex rel. A.B., 219 N.J. 542, 554-55 (2014).

A-0364-20

The adjudication of abuse or neglect is governed by Title Nine, which is designed to protect children.  N.J.S.A. 9:6-1 to -8.114.  Pursuant to N.J.S.A. 9:6-8.21(c), an abused or neglected child is:

> a child less than [eighteen] years of age whose parent . . . (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; (3) commits or allows to be committed an act of sexual abuse against the child; (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court . . . .

The Division "must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'"  N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)).  Each case of alleged abuse "requires careful, individual scrutiny" and is "generally fact sensitive." Id. at 33.  The proofs must be evaluated based on the totality of the circumstances.  Id. at 39.

A-0364-20

The statute does not require the child to suffer actual harm. N.J.S.A. 9:6-8.21(c)(4). Instead, abuse or neglect is established when a child's "physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired." Ibid. When there is an absence of actual harm, but there exists a substantial risk of harm or imminent danger, the court must consider whether the parent exercised a "minimum degree of care" under the circumstances. N.J. Div. of Youth & Fam. Servs. v. S.I., 437 N.J. Super. 142, 153 (App. Div. 2014) see N.J. Div. of Child Prot. & Permanency v. J.A., 436 N.J. Super. 61, 68 (App. Div. 2014) (finding that a minimum degree of care "means 'grossly or wantonly negligent, but not necessarily intentional' conduct." (quoting G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 178 (1999))).

Dana is a mother of six children, including Sasha. Dana is married to Derrick, who is the father of two of her children and stepfather to Sasha.

On March 6, 2016, the Division received a referral from the Willingboro Police Department that Sasha, then thirteen years old, had alleged that Derrick raped her. When the officer initially responded to the home, he found Dana, Derrick, Sasha, and M.J. (Michael)[3] arguing. Michael told the officer that Sasha

---

[3] Michael is Derrick's brother.

showed him a note from her diary that indicated that she was raped when she was younger and that it never stopped. When the officer read the diary,[4] he observed comments that Sasha felt dirty and blamed herself. The officer escorted Derrick from the home. The Division later assessed the home and spoke to Dana.

On March 23, 2016, Sasha was examined by Dr. Monique Higginbotham, a pediatrician at the CARES Institute. Dr. Higginbotham obtained a history from Dana. In her report, Dr. Higginbotham indicates that Dana, who appeared visibly distressed, was told by Michael that Sasha gave him a note indicating that she and Derrick were "having sex every other night." Dana also told Dr. Higginbotham that Sasha directly disclosed that they had sex, but Dana was unsure if that is true or not. Dana reported that Michael observed that Sasha threatened to kill herself and was taken to a hospital due to this apparent suicide attempt.[5] Dana reported that Sasha has been crying every day.

Dr. Higginbotham also interviewed Sasha. Sasha refused to permit Dr. Higginbotham to conduct a physical examination. Sasha revealed that the first

---

[4] The diary did not reference Derrick by name.

[5] Dr. Higginbotham documented that Sasha had no prior history of anxiety, depression, or suicide attempts.

A-0364-20

person she confided in about the sexual abuse allegations was Michael. Sasha disclosed that she did, in fact, try to kill herself but Michael intervened. Sasha indicated that the suicide attempt was related to the incidents with Derrick. At the time of the interview, Sasha told Dr. Higginbotham that she still sometimes felt suicidal. Sasha declined to talk specifically about the nature of the sexual abuse. Sasha informed Dr. Higginbotham that Dana took her best friend away from her because she was afraid they would have sex; when asked if they had sex, Sasha replied "I feel violated, and I will always feel violated. Why would I let anyone else do that?"

Based on the reported disclosures and her apparent suicide attempt, Dr. Higginbotham suspected Sasha was sexually abused. Dr. Higginbotham recommended that Sasha undergo a psychiatric evaluation, to screen for suicide and depression, as well as trauma-focused cognitive behavioral therapy. Dr. Higginbotham noted that a safety assessment was warranted for Sasha as the alleged perpetrator is a close family member and she may be at risk for further harm in his presence.

Following an investigation, the Division substantiated the allegations that Derrick sexually abused Sasha. N.J.A.C. 3A:10-7.3(c)(1); N.J.A.C. 3A:10-

7.3(d). Derrick never requested an administrative hearing to appeal that finding. See N.J.A.C. 3A:5-2.5.

On July 6, 2016, Dana and the Division entered into a family agreement.[6] The agreement, which Dana signed, required that Dana would not allow Derrick to have any contact with Sasha "because he was substantiated for sexually abusing [Sasha]."

On November 1, 2016, the Division investigated a referral that Sasha was "fighting a lot" in school and a report that she was homicidal because Dana kept "allowing the man who molested her into the home." Another referral was made on November 23, 2016, due to allegations that Sasha was hitting the other children and left them unattended at the park.

In a subsequent interview with Division workers, Dana admitted that she allowed Derrick to sleep at home one night. Dana also admitted that she picked up Derrick during the week and brought him home to visit his children. She indicated that Sasha typically left the home when Derrick came to visit.

Sasha, in an interview with Division workers, indicated that she refused to go back home because Dana kept allowing Derrick back into the home. She

---

[6] The family agreement permitted Derrick to have only supervised visitation with his two children.

told the workers that Derrick slept there on a regular basis. As a result, she was forced to leave the house daily because she was uncomfortable and in fear that Derrick might abuse her again. She revealed that Derrick started abusing her when she was nine years old until she told Michael about the abuse around her thirteenth birthday. Sasha asserted that, while Dana initially believed her, Dana "started calling her a liar." She stated that she had contemplated killing herself in the past because Dana was choosing Derrick over her. Sasha also indicated that some days she did not eat because she was depressed. The caseworker asked Sasha if she would be willing to speak with police, and Sasha answered in the affirmative.

On November 27, 2016, the Division received a third referral from the Willingboro Police Department after Sasha ran away because Dana let Derrick back into the home. Based on that referral, the Division conducted a Dodd removal of Sasha that same day.[7]

On December 30, 2016, Sasha was interviewed by Sgt. Mike Krug. During that interview, she informed Sgt. Krug that Derrick had raped her more

---

[7] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82." N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

than one hundred times. Sasha indicated that she told Michael about the allegations after she got caught trying to kill herself and, in fact, on one occasion did cut herself. When Sgt. Krug tried to get Sasha to open up about the specifics of the allegations, she kept telling him that he could not look at her.

On March 28, 2017, a Title Nine fact-finding hearing was conducted. The Division called two witnesses: Sasha's treating physician, Dr. Higginbotham, and the case manager, Jennifer Palumbo.

Dr. Higginbotham has worked as a child abuse pediatrician at the CARES Institute for five years and is board-certified in general and child abuse pediatrics.[8] Dr. Higginbotham testified about her interviews of Dana and Sasha in March 2016 and about her findings based on those interviews. Dr. Higginbotham indicated that, during her second evaluation of Sasha, which occurred in March 2017, she found no evidence of STDs or sexual trauma, and Sasha's hymen was still intact and there was no sign of transection. She highlighted, however, that she did not expect any findings related to sexual

---

[8] Over the objection of the Law Guardian, but not Dana's counsel, the judge accepted Dr. Higginbotham as an expert in child abuse pediatrics. Child abuse pediatrics encompasses child sexual abuse.

A-0364-20

trauma because Sasha indicated that the "last time . . . something happened with [Derrick] had been a year prior to her being examined . . . ."[9]

Palumbo testified she is an intake worker who has been employed by the Division for seven years. She testified about Derrick's substantiated case, the family agreement that Dana signed, and the three referrals and subsequent investigation.

Dana did not call any witnesses. Dana's counsel took no position on the Division's request for a Title Nine finding against Derrick but argued the family agreement was insufficient to establish a Title Nine finding against Dana. Dana's counsel contended that Dr. Higginbotham's testimony did not establish any physical evidence of sexual abuse and that Sasha's behavioral issues were consistent with other issues. Dana's counsel conceded, however, that Derrick would visit the home and Sasha would consequently leave the home.

At the conclusion of the hearing, the judge issued his oral decision finding Dana had abused or neglected her daughter. He determined that Sasha's allegations were specific, expansive, and consistent. The judge found that Sasha's testimony was corroborated by Dana's admission of allowing Derrick

---

[9] Specifically, two days before Sasha's thirteenth birthday.

into the home, the medical and scientific evidence provided by Dr. Higginbotham, and the effect that it had on the child.[10] The judge also observed that the manner in which Sasha behaved during her statement to Sgt. Krug – including the facts that she was in the corner, she did not want to look at him, she was hiding under her jacket, and she was writing on a board rather than speaking – highlighted the traumatic nature of the incidents.

With respect to Dana, the judge found that:

> What is important is that [Dana] knew that [Derrick] had sexually assaulted her daughter, yet she permitted [–] agreement or not, validity or not [–] [Derrick] back in the home on a regular basis. She acknowledged it.
>
> This caused [Sasha] to suffer even more emotional harm than she already had suffered. This caused [Sasha] to run away, and this caused [Sasha] also to be at substantial risk for this to happen again.

Indeed, the judge observed that:

> And certainly it breaks your heart to hear the child's view, and it is a justified view that [Dana] is choosing [Derrick] over [her]. And that is emotional harm, to the [c]ourt.
>
> This whole issue, well, okay, he should be able to come over to the house and visit his children and

---

[10] The judge noted that "children can have breakdowns and have suicide attempts and can even feel very, very badly about things for other reasons other than sexual abuse, but it all fits here, and it is all explained."

A-0364-20

besides, this is a married couple, and so it is almost seemingly like it is okay, [Sasha] should leave. If [Derrick] comes over, then [Sasha] should leave.

No. She is a child. She is the one that should not have to take action to protect herself.

She can't drive. She is [thirteen] when this is going on. It is not her responsibility. It is not up to her to do this. It is the mother's job. [Dana's] job.

Based on the above, the judge concluded that Dana created or allowed to be created a substantial risk of ongoing injury, N.J.S.A. 9:6-8.21(c)(2), because

she allowed [Derrick] to be in the same location with the child knowing that [Derrick] had sexually assaulted her child . . . on prior occasions, and knowing that this was something the Division was concerned about, and knowing that she was . . . not supposed to have them be in the same location[.]

The judge also concluded that Dana failed to provide Sasha with adequate shelter when Derrick would come to the home, N.J.S.A. 9:6-8.21(c)(4)(a), as well as the failure to provide Sasha with proper supervision and creating substantial risk by allowing Derrick back due to the potential acts of renewed sexual assault. N.J.S.A. 9:6-8.21(c)(4)(b). The judge issued an accompanying written order. This appeal followed.

We reject Dana's argument that the judge erred in finding that Dana placed Sasha at risk of harm. Dana was aware of the sexual abuse because Sasha wrote

a note about it that Dana read and consequently sought therapy for Sasha. It is undisputed that the Division substantiated the allegations that Derrick sexually abused Sasha. Derrick did not request an administrative hearing to appeal that decision. On July 6, 2016, Dana signed the family agreement, which required that Dana not allow Derrick to have contact with Sasha. It is undisputed that Dana permitted Derrick to return to the home following the substantiation and despite the family agreement.

We also reject Dana's argument that the trial court erred in its application of the law regarding corroboration of Sasha's out-of-court allegations. In an abuse or neglect proceeding, children's out-of-court statements "relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact[-]finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4). "A child's statement need only be corroborated by '[s]ome direct or circumstantial evidence beyond the child's statement itself.'" N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 157 (App. Div. 2018) (alteration in original) (quoting N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 522 (App. Div. 2017)).

A-0364-20

"The most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003)). Such indirect evidence has included "a child victim's precocious knowledge of sexual activity, a semen stain on a child's blanket, a child's nightmares and psychological evidence." N.J. Div. of Child Prot. & Permanency v. I.B., 441 N.J. Super. 585, 591 (App. Div. 2015) (quoting N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002)). Evidence of "age-inappropriate sexual behavior" can also provide the necessary corroboration required under N.J.S.A. 9:6-8.46(a)(4). Z.P.R., 351 N.J. Super. at 435-6. In N.B., the court found no corroboration where the child "denied thoughts of self-harm; his mood was normal and appropriate; he was cooperative during his evaluation; . . . and he denied problems with appetite, sleep, or mood." 452 N.J. Super. at 522.

The Family Part judge correctly determined that there is ample evidence to corroborate Sasha's allegations of sexual abuse. As the judge found, Sasha's statements to various individuals, including Michael, Dr. Higginbotham,

17

Division workers, and Sgt. Krug, were consistent.[11]  Significantly, there was evidence of self-harm.  Sasha, on at least one occasion, attempted to commit suicide.  Even at the time of her interview, Sasha told Dr. Higginbotham that she still sometimes felt like killing herself.

There is also evidence of disturbances in Sasha's mood and appetite.  Dana informed Dr. Higginbotham that Sasha was crying almost every day.  Sasha informed Division workers that some days she refused to eat because she was depressed.  Indeed, one referral was due to reports that Sasha was fighting a lot in school.  Finally, Sasha was largely uncooperative during interviews and evaluations.  In the initial evaluation by Dr. Higginbotham, Sasha refused to undergo a physical examination.  During her interview with Sgt. Krug, she could not verbalize the encounters with Derrick and was forced to write them down on a whiteboard.  When pressed on the specifics, Sasha kept telling Sgt. Krug that he could not look at her.  At one point in the interview, Sasha went to the corner of the room and put her winter jacket over her head.

We discern no error in the judge's finding that there was ample corroborative evidence to support his conclusion that Derrick sexually abused

---

[11]  When reviewing a child's hearsay statement under N.J.R.E. 803(c)(27), the court may consider the child's repetition and consistency of statements, but "consistency alone does not constitute corroboration."  N.B., 452 N.J. Super. at 523.

Sasha, that Dana knew of the abuse, and took no steps to protect her daughter in violation of her agreement with the Division.

To the extent not addressed, we conclude Dana's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0364-20