# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0147-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

M.Q.,

     Defendant-Appellant/
Cross-Respondent,

and

W.L.,

     Defendant.

_____

IN THE MATTER OF K.L.,
W.L., JR., and C.L., minors,

     Cross-Appellants.

_____

Submitted April 29, 2025 – Decided May 9, 2025

Before Judges Gooden Brown and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0131-22.

Jennifer N. Sellitti, Public Defender, attorney for appellant/cross-respondent (John A. Albright, Assistant Deputy Public Defender, of counsel and on the briefs; Gladys Moriarty, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Alicia Y. Bergman, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors/cross-appellants (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant M.Q.[1] (Mary) and minors, K.L. (Kate), W.L., Jr. (Wesley), and C.L. (Cara) (collectively the children), appeal from the portion from a Family Part order, entered following a fact-finding hearing, determining Mary had neglected her minor child, Kate. Based on our thorough review and application of prevailing law, we reverse.

---

[1] We use initials or pseudonyms to protect the privacy of all parties in accordance with Rule 1:38-3(d)(12).

## I.

We discern the salient facts from the record developed at the fact-finding hearing. At the hearing, the Division of Child Protection and Permanency (Division) proffered three witnesses: (1) Luz K. Torres, a caseworker with the Division; (2) Katie Cruz, a clinician with the Metro Regional Diagnostic and Treatment Center (RDTC); and (3) Dr. Groisberg, a child abuse pediatrician with the RDTC. Neither Mary nor the Law Guardian called any witnesses. W.L. (Wade) waived his right to participate.

Mary is the mother of Kate, Wesley, and Cara, ages ten, nine, and three, respectively. Wade is Mary's husband and the biological father of all three children.

On Sunday, April 24, 2022, Kate was at her maternal aunt M.R.Q. (Mendi)'s home, while her younger siblings remained with her parents. Mary and Wade began consuming alcohol in the afternoon. When Mendi returned Kate to the family home around 8:00 p.m., both Mary and Wade were "drunk," and Mendi decided to take Kate and her siblings to her home for the night. Once back at Mendi's home, Kate disclosed that Wade had been sexually abusing her.

A-0147-23

Mendi reported Kate's disclosure to the police, and they made a referral to the Division. Division caseworker Torres commenced an investigation and visited the family the next day.

Essex County Prosecutor's Office Detective Felder and Forensic Interviewer Jocelyn Rivera also spoke with Kate. During her interview, Kate reported that her father, Wade, sexually abused her in the home on Sundays while Mary was "passed out sleeping," and provided details of the abuse.[2] Kate described her parent's drinking habits and stated her parents drink "a lot of beers" in blue and red cans "every Sunday," with the children at home.

During Wesley's interview, he confirmed Kate's account of their parents' alcohol use and provided additional details. He stated every Sunday afternoon, his parents would start drinking alcohol in "large blue and red cans." Wesley further reported that "after his mother drinks five to seven beers, she is drunk and goes to bed" while his father continued drinking alone in the living room.

During Mary's interview, she confirmed that she and Wade drink beer "almost every weekend" and that Wade drinks more than she does. She reported the two of them usually split a twelve-pack of beer, each drinking six, and that

---

[2] In a statement to police, Wade confessed to sexually abusing Kate and he was subsequently arrested on April 27.

A-0147-23

she usually goes to sleep while Wade continues drinking. Mary also stated that she and Wade went to a local bar to drink the night before from approximately 12:40 a.m. to 3:00 a.m., leaving the children home alone sleeping.

Mary stated she had been unaware of Kate's sexual abuse. The only incident she was aware of was when Wade once went to Kate's room, appeared drunk, and licked Kate's face. Mary confirmed that on April 24, her sister Mendi, decided to take the children out of the home because she and Wade were drinking, and Mendi "was trying to take the kids out of that environment."

On May 3, 2022, Dr. Groisberg conducted a medical evaluation of Kate. During the evaluation, Kate repeated her previous disclosures of sexual abuse, stating Wade sexually abused her "every Sunday when her parents were drunk" after her mother went to bed and on other days when he was sober. Kate stated her parents would drink "large" cans of beer, and she could tell they were drunk because her father "was not able to walk okay and his eyes were red," and her mother "was not able to talk okay."

While speaking with Dr. Groisberg, Kate further described additional sexual abuse that occurred when she was nine years old by a male non-relative staying at their home while the family was living in Ecuador. Kate stated she

A-0147-23

disclosed the abuse to the man's wife, but the man's wife just laughed about it with her parents.

On May 18, 2022, Mary participated in a Child Protection Substance Abuse Initiative evaluation and was recommended for "Level 1" outpatient services. During this evaluation, Mary stated her pattern of alcohol use was "once-a-week when she normally has 'five tall beers' which are [twenty-four] ounces [each] . . . ."

During the fact-finding hearing, Torres testified that, upon entering the kitchen during her visit to the family home, she observed "several [empty] beer cans in the kitchen" which Mary admitted were from the alcohol they drank over the weekend.

Cruz testified regarding her evaluation of Kate who described the sexual abuse consistently with her report to Torres that

> she observed both of her parents consuming beer . . . every Sunday. She said they would split a 24-pack of beer . . . . She said when her mother was intoxicated . . . [she] would fall asleep or it was hard for her to understand what her mother was saying. She said when her father was intoxicated, his eyes would get red, he would have difficulty walking, and he would start to look at her weird . . . .

6

At the close of the fact-finding hearing, the court issued an oral decision, finding by a preponderance of the evidence that Mary neglected Kate under N.J.S.A. 9:6-8.21(c)(4)(b). The trial court found all witnesses proffered by the Division were "extraordinarily credible," "truthful" and "[t]here were no attempts . . . by anyone to exaggerate, to overstate, to interpret anything they were reporting."

Based on the evidence and testimony presented, the court found Mary committed child neglect when she consumed alcohol to the point of "intoxication" resulting in her being "oblivious" to Kate's sexual assaults. The court found: (1) while Mary initially denied drinking, she made several admissions, including that she buys a twelve-pack of beer, tall cans, and that she falls asleep after drinking; (2) Wesley's descriptions of the substance use in the home constituted "precocious knowledge," such that it had to be from his experience; (3) Kate and Wesley's statements regarding alcohol use in the home corroborated each other; (4) Mary reported to the Division that she left the children home sleeping while she and Wade went to a local bar; and (5) Torres observed consumed beer cans in the kitchen when she visited the family home. The court found Mary's denial of sleeping due to intoxication was not credible.

The court explained that "[Mary and Wade's] continued substance abuse placed [Kate] at a substantial and imminent risk . . . . [The court is] satisfied that the Division has proven by a preponderance of evidence the allegations of sexual abuse of [Kate] by [Wade] and of all the charges that have . . . manifested in this complaint . . . ." Based on these findings, the court issued a judgment finding Mary neglected Kate.

II.

"[W]e accord substantial deference and defer to the factual findings of the Family Part if they are sustained by 'adequate, substantial, and credible evidence' in the record." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). We ordinarily accord such deference because of the Family Part's "special jurisdiction and expertise," N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)), and its "opportunity to make first-hand credibility judgments about the witnesses . . . [and have] a 'feel of the case' that can never be realized by a review of the cold record," N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).

"Nevertheless, if the trial court's conclusions are 'clearly mistaken or wide of the mark[,]' an appellate court must intervene to ensure the fairness of the proceeding." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 226-27 (2010) (alteration in original) (quoting E.P., 196 N.J. at 104). We owe no deference to the trial court's legal conclusions, which we review de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

### III.

"Abuse and neglect actions are controlled by the standards set forth in Title Nine of the New Jersey Statutes." N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 31 (2011). The purpose of a fact-finding hearing is "to determine whether the child is . . . abused or neglected . . . ." N.J.S.A. 9:6-8.28(a), -8.3(a), -8.32. "If the facts are sufficient to sustain the complaint, the court will enter an order finding that the child is an abused or neglected child and set forth the ground for such finding." N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 615 (App. Div. 2010) (citing N.J.S.A. 9:6-8.50(a)). In making a fact finding of abuse or neglect, a court considers "the totality of the circumstances, since '[i]n child abuse and neglect cases the elements of proof are synergistically related.'" N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J.

Super. 320, 329 (App. Div. 2011) (quoting N.J. Div. of Youth & Fam. Servs. v. C.H., 414 N.J. Super. 472, 481 (App. Div. 2010)).

Regarding "the quantum of proof required in a fact-finding hearing brought under Title Nine, . . . it is well established that [the Division] must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" P.W.R., 205 N.J. at 32 (citation omitted) (quoting N.J.S.A. 9:6-8.46(b)).

An "[a]bused or neglected child" includes a minor child

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, . . . or by any other acts of a similarly serious nature requiring the aid of the court . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

"It is difficult to marshal direct evidence of parental abuse and neglect because of the closed environment in which the abuse most often occurs and the limited ability of the abused child to inculpate the abuser." N.J. Div. of Youth & Fam. Servs. v. S.S., 275 N.J. Super. 173, 179 (App. Div. 1994). "[N]on-intentional conduct is sufficient to warrant a finding of abuse if the injury to the

10

child is demonstrated." N.J. Div. of Youth & Fam. Servs. v. S.S., 372 N.J. Super. 13, 24 (App. Div. 2004) (citing G.S. v. N.J. Div. of Youth & Fam. Servs., 157 N.J. 161, 175-82 (1999)).

"Minimum degree of care refers to conduct that is grossly or wantonly, negligent, but not necessarily intentional." G.S., 157 N.J. at 178 (internal quotations omitted). "Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." Ibid. (citing McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970)). To that end, a parent "fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181. "When a cautionary act by the [parent] would prevent a child from having his or her physical, mental or emotional condition impaired, that [parent] has failed to exercise a minimum degree of care as a matter of law." Id. at 182.

"Thus, under a wanton and willful negligence standard, a person is liable for the foreseeable consequences of [her] actions, regardless of whether she actually intended to cause injury." Id. at 179. "[T]he inquiry should focus on the harm to the child and whether that harm could have been prevented had the [parent] performed some act to remedy the situation or remove the danger." Id.

at 182. If a parent's act or omission does not meet the "minimum degree of care" required by law, the substantiated finding must stand. Ibid.; see also N.J. Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 306-09 (2011) (reaffirming the G.S. test).

Applying these principles, we are satisfied the record is devoid of any competent evidence to support a conclusion that Mary was aware of the inherent danger of placing Kate under the supervision of Wade, her biological father. Kate's complaint of sexual abuse by a non-relative in Ecuador years prior is not sufficient to alert Mary to Wade's abuse of Kate. The only evidence in the record is that Mary found out about the sexual abuse upon Kate's report to her aunt and was "distraught." There were no facts adduced at the hearing to show Mary should have known about Wade's abuse and taken action to protect Kate.

Nor can we conclude, based on prevailing law, that Mary's intoxication placed Kate, and the other children, at imminent risk of harm. We have acknowledged "[t]he Division would be quickly overwhelmed if law enforcement was required to report every individual under the influence who had children." See V.T., 423 N.J. Super. at 331 (proof of a parent's drug use by itself was not enough to sustain a finding of abuse or neglect, where a father used drugs prior to his supervised visits with an eleven-year-old child).

12

In this case, we conclude that Mary's intoxication, without more, does not substantiate a finding of neglect. Despite Mary drinking to the point of intoxication, she left Kate in the care of her biological father while she went to sleep. Leaving a child in the care of their biological parent, without more, is not an inherently dangerous act, posing a substantial risk to the child.

Unlike in A.B., where the mother knew of the inherent danger posed to a sixteen-year-old who was caring for a newborn infant on her own, Mary was unaware of the potential danger Kate would be facing in the care of her biological father. A.B., 231 N.J. at 358, 370 (finding the defendant abused or neglected her sixteen-year-old daughter in failing to report she had run away, after recently giving birth, and refusing to permit the two to return to the family home because the conduct was "grossly negligent [where the defendant] was clearly aware of the dangers inherent in the situation"). There is no evidence to suggest that Mary was aware, or had reason to suspect, that Wade was sexually abusing Kate. Rather, the undisputed record establishes that Mary was unaware of the sexual abuse. Kate reported that Mary did not know her father had been sexually abusing her, and Mary consistently denied "being aware of the allegations prior to the Division's involvement." Kate further reported Wade made efforts to prevent her from screaming for help when sexually abusing her

13

by placing his hand over her mouth. During the fact-finding hearing, Torres testified Mary "had no indication that [the abuse] was happening" and when informed of the allegations, she was naturally "distraught."

The Division argues Wade had "engaged in dangerous behavior with Kate when he was drunk on a previous occasion," where he previously went into Kate's room, appearing drunk, and licked her face. We are unpersuaded Mary was aware, or should have known, that Wade was sexually abusing Kate based on this non-sexual behavior. While Kate states her father's behavior made her uncomfortable, she does not assert that Wade tried to sexually abuse her during the encounter. The Division fails to cite to any prevailing law supporting the assertion that an act of a similar nature constitutes evidence of sexual abuse sufficient to provide notice to Mary.

We are unconvinced, based upon application of prevailing law, that Mary abused or neglected the children when she and Wade left the children sleeping home alone while they went to a bar. Recently, our Supreme Court held in Title Nine cases, "[a]bsent proof of actual impairment, 'the critical focus is on evidence of imminent danger or substantial risk of harm.'" N.J. Div. of Child Prot. & Permanency v. B.P., 257 N.J. 361, 376 (2024) (quoting N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 22 (2013)). The danger to a child must

be imminent, and "the mere possibility of a child being impaired is [in]sufficient." Id. at 379.

In B.P., the mother of a newborn left her infant in the hospital after providing evasive information to the Division, despite having previously indicated an intent to care for her child. Id. at 366-67. The Court concluded this conduct did not violate Title Nine, noting "these facts might not present an ideal scenario for a newborn child, [but] they do not prove that [the child] was abused or neglected as defined in the statute." Id. at 380. The B.P. Court further emphasized

> N.J.S.A. 9:6-8.21(c)(4)(a) requires a finding that as a result of the parent's failure to exercise a minimum degree of care, the child's "physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired." (emphasis added). The statute does not state that the mere possibility of the child being impaired is sufficient . . . . It is unlikely that the Legislature would have chosen the word "imminent" to describe an outside possibility of a child becoming impaired or the infinite number of scenarios that could transpire. Nothing in the plain reading of the statute suggests that any number of hypotheticals in the circumstance here would suffice to establish that a parent placed a child in imminent danger of impairment.
>
> [Id. at 379-80.]

The Division's argument is unpersuasive in light of B.P. We are unpersuaded by the Division's hypotheticals as to scenarios that could have transpired while Mary and Wade left the children home alone, as expressly prohibited under the Court's holding in B.P. There is no evidence in the record before us to suggest the children's "physical, mental, or emotional condition ha[d] been impaired or [was] in imminent danger of becoming impaired" while the children were home alone. There is no evidence in the record to suggest the children were even aware they had been left home alone at all or suffered any adverse effects because of the situation. The "mere possibility" an emergency could have occurred while the children were sleeping home alone is insufficient for a finding of abuse or neglect under the Court's holding in B.P.

In light of our conclusion, we reverse the trial court's finding of neglect against Mary and direct the Division to remove Mary's name from the Child Abuse Registry within ten days of the date of this opinion.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

16

A-0147-23